# Morrison v. United Optical Workers Union

*David B. Dowling,* for plaintiff.
*Charles W. Johnston, Jr.,* for defendant.

CALDWELL, *J.,* November 6, 1981—Plaintiff, Dr. Robert J. Morrison, is a licensed optometrist who, along with others, maintains a practice under the name of Morrison Associates at Green and Division Streets in Harrisburg. Located in the basement of the same building is Morrison Laboratories, a corporation engaged in the manufacture of contact lenses.

Prior to 1968, plaintiff was the founder and majority stockholder of Morrison Laboratories. In June of that year he sold the business to the Union Corporation,[1] which has owned and operated it since that time.

The employes of Morrison Laboratories were represented by the United Optical Workers Union (U.O.W.U.) Local 408, until July 1979 when the local was decertified as their exclusive bargaining agent.

Approximately three years ago, in 1978, the employes of Morrison Laboratories went on strike over a wage dispute with that entity, and began picketing which has continued to the present date. Defendants are picketing on the sidewalks around the building which houses both the laboratory and the optometry practice of Dr. Morrison. They also patrol the parking lot immediately adjacent to the building, despite the fact that the use of the lot is

---

1. Union Corporation is a large company listed on the New York Stock Exchange.

limited to the patients and associates of Dr. Morrison.[2]

While so demonstrating defendants carry signs and distribute leaflets to the public. Both the signs and the leaflets explicitly represent that Dr. Morrison retains a controlling interest in the laboratory. The leaflets specifically request that members of the public support the union in its strike because Dr. Morrison has deprived *his* employes of a decent wage.

Additionally, defendants voiced their grievances in the Pennsylvania AFL-CIO Union newsletter, seeking the support of other labor unions.

It is undisputed that no outbreaks of violence have occurred in the three years the demonstrators have been picketing. However, on May 20, 1981, a mass demonstration was held with over 50 persons participating, many of whom were members of other unions who support defendants' cause.

On June 2, 1981, plaintiff filed a complaint seeking to enjoin these activities which are occurring outside his professional offices. Morrison alleges that the signs and leaflets used by defendants contain material designed to deliberately mislead and confuse the public, and to cause the public to believe that plaintiff controls Morrison Laboratories and is treating its employes unfairly.[3]

2. The entrance to the basement and Morrison Laboratories is from Penn Street which adjoins the west end of the building. The parking lot is along the south side of the building and is entered from Green Street, or from the east. The entrance to Morrison Associates is on Division Street, which adjoins the northern side of the building.

3. Defendants filed a petition for removal to the United States District Court on June 9, 1981, alleging that by virtue of the Labor Management Relations Act exclusive original jurisdiction of this dispute lies in the Federal courts. On August 5, 1981, the petition for removal was denied and the case was remanded to this court.

After a full evidentiary hearing on September 3, 1981, we have concluded that none of the defendants are employes of plaintiff or of Morrison Associates, nor do defendants represent or seek to represent plaintiff's employes. Defendants nonetheless are directing their picketing against Dr. Morrison personally, because of their insistence that Dr. Morrison would be able, if he so elected, to accede to their demands concerning Morrison Laboratories. The evidence developed at the hearing proved beyond doubt, however, that Dr. Morrison does not own Morrison Laboratories, retains no interest in that business, and is not a party to any labor dispute.

The purpose of this proceeding is to prohibit and restrain defendants from picketing and maligning plaintiff, and to limit the places where defendants may picket Morrison Laboratories. Defendants filed preliminary objections in the form of a motion to dismiss, and we will dispose of those objections as well as the merits of plaintiff's complaint.

Defendants' first argument is that an injunction as to their activities would amount to a prior restraint on the right of free speech and infringe upon the freedom of expression, as guaranteed by both the United States and Pennsylvania Constitutions. It is axiomatic that our society places great value on the right of an individual to freely communicate his ideas. For that reason the courts have imposed a heavy presumption against the constitutional validity of any prior restraint on speech: N.Y. Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed. 2d 822 (1971); Organization for a Better Austin v. Keefe, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed. 2d 1 (1971).

As a mode of free expression, picketing has been granted broad but not unlimited constitutional protection. Peaceful picketing, as in the instant case,

cannot be enjoined merely because there is no immediate employer-employe dispute or because those who are picketing are not employes of or are strangers to the employer: A.F. of L. v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855 (1941). However it is more than clear that freedom of speech can be abused when the underlying labor objective is illegal, and under such circumstances even peaceful picketing may be properly enjoined. In Hughes v. Superior Ct. of Calif., 339 U.S. 460, 465-66, 70 S.Ct. 718, 94 L.Ed. 985 (1950), the court enjoined peaceful picketing stating:

"It has been amply recognized that picketing, not being the equivalent of [free] speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a State if the *manner* in which picketing is conducted or the *purpose* which it seeks to effectuate gives ground for its disallowance." (Emphasis supplied.) See also Wortex Mills, Inc. v. Textile Workers Union of America, 369 Pa. 359, 85 A. 2d 851 (1952).

In assessing the constitutionality of an injunction against picketing "[t]he controlling question is whether the picketing which was prohibited was for an unlawful purpose. If the purpose was unlawful the case presented was within the general equity jurisdiction of the court. . . . An injunction restraining unlawful picketing is not an infringement of the constitutional guaranty of free speech." Wilbank v. Chester & Delaware Counties Bartenders etc. Union, 360 Pa. 48, 50, 60 A. 2d 21, 22 (1948).

Recently, in Rouse Philadelphia Inc. v. Ad Hoc '78, 274 Pa. Superior Ct. 54, 417 A. 2d 1248 (1979), the Pennsylvania appellate court upheld a preliminary injunction against a defendant appealing from a civil contempt fine. There, defendant and a

group of individuals ranging in number from 5000 to 37 massed on several days at locations in and around entrances to a shopping mall in downtown Philadelphia known as The Gallery and also at Gimbels Department Store located nearby. Ingress and egress to both places was rendered difficult, and at times impossible. The demonstrators continued to protest despite a preliminary injunction forbidding their activities.

At the several hearings held on the matter evidence was presented that, among other things proved:

"[T]he demonstrators shouted and chanted so loudly that normal conversation was impossible anywhere in the vicinity; . . . that a group of the demonstrators sat down and sprawled in the walkways of The Gallery and in the 'Market Fair' area of the mall . . .; that when so situated they listenedto and gave speeches over amplifying equipment and stood on tables in the restaurants thereby denying patrons of ingress and egress to the area; that as a result of this activity shops in the mall closed, patrons left the area and business in the mall and other stores was brought to a virtual standstill. . . . Several demonstrators had engaged in violent incidents during the picketing. . . . The demonstrators also ignited a number of fires throughout the mall by igniting the refuse in trash receptacles located throughout the mall." 274 Pa. Superior Ct. at 62-63, 417 A. 2d at 1253.

Admittedly no labor dispute of any type existed between the parties. Rather, defendants urged patrons to boycott The Gallery and Gimbels alleging that certain Federal funds used in construction of the shopping mall should have been used instead to provide low-income housing in the area.

The Gallery is owned by the Redevelopment Authority of Philadelphia (RDA). However, by virtue of a 99 year lease of the mall from RDA to Rouse Corporation, the Pennsylvania Superior Court found that defendants' demonstration in fact constituted a boycott of the 94 private owners renting space within the mall. These individual shopowners had neither the power to direct the city to alter the formula for the distribution of government funds nor can they effectively bring about the ownership of more businesses by minorities.

Quoting the trial court, the Superior Court classified defendants' activities as a form of "scapegoat boycotting" which:

"'. . . urges concerted refusal to have business relationships with a "target" consisting of a limited number of persons, for the purpose of protesting against and symbolizing protest against actions and conduct of third parties, although the *target*" *has no relationship to or involvement in or any control over or power to affect the primary disputes between the protestors and third parties.* . . . In a true scapegoat boycott the "target" has no power or authority to force concessions from third parties. In a true scapegoat boycott there is no real or bona fide dispute, primary or secondary, between the "target" and the boycotter.'" 274 Pa. Superior Ct. at 66, 417 A. 2d at 1255 (emphasis supplied).

The court noted that scapegoat boycotting amounts to an unlawful, and therefore enjoinable, interference with business relations, and that "[o]ne has a right to pursue his business relations free from interference on the part of other persons except where such interference is justified or constitutes the exercise of an absolute right." Id. 274 Pa. Superior Ct. at 68, 417 A. 2d at 1256.

We think the activities of defendants in the instant action clearly constitute an illegal boycott of Dr. Morrison, as described by he Rouse court. Despite ample opportunity to do so at the evidentiary hearing defendants failed to present *any* evidence substantiating their belief that Dr. Morrison is or was the chairman of the board of the Union Corporation (the owner of Morrison Laboratories) or that Morrison's brother-in-law, who has been employed by Union Corporation since September 1968 and now manages Morrison Laboratories, serves merely as a spokesman for plaintiff. In fact, Morrison's uncontradicted testimony established conclusively that since the sale of the business to Union Corporation 13 years ago he retains no control whatever over the management policies of Morrison Laboratories. Plainly, defendants are demanding concessions from Dr. Morrison which he is powerless to grant.

By encouraging a public boycott of Dr. Morrison's optometry practice defendants are attempting to coerce plaintiff, who is a third person insofar as their grievances are concerned, to take action in furtherance of union objectives. Such conduct has been determined to be contrary to the judicial and legislative policies of the Commonwealth, and as such, properly enjoinable: Callahan-Penn, Inc. v. District 65 Retail, Wholesale & Department Store Union, 35 Labor Cases 97,760 (C.P. Phila. 1958).

In Callahan-Penn defendant union picketed Bonwit Teller of Philadelphia although its labor dispute was solely with T. & F. Callahan, Inc., the licensee and operator of the shoe departments of Bonwit Teller of New York. Bonwit Teller of New York was found to be a distinctly separate corporation from its Philadelphia counterpart, and defendant's extension of its picketing from New York City to Philadelphia was designed to gain sympathy

and support for the labor dispute in New York. The Philadelphia Court of Common Pleas held that the picketing was illegal, and hence enjoinable, since its obvious purpose was to interfere with the sales of Bonwit Teller of Philadelphia and force it to exert pressure on Bonwit Teller of New York to settle its labor dispute.

Clearly defendants' objectives in the instant case are identical to those of the Callahan strikers. Both are aimed at coercing a third party, plaintiff, to pressure the demonstrators' employer on their behalf.

Defendants also contend that libel and slander are actions at law and that equitable relief is therefore inappropriate, citing Baltimore Life Insurance Co. v. Gleisner, 202 Pa. 386, 51 Atl. 1024 (1902). While this is a correct statement of the general rule, Pennsylvania courts have recognized a narrow exception where there is a conspiracy to injure a plaintiff's business.

In e. m. w. bar Corp. v. Hilliard, 20 D. & C. 2d 435 (1959), the Philadelphia County Court en banc permanently enjoined neighborhood residents from peacefully picketing a lawfully operated taproom. In an effort to compel plaintiff to either relocate or close his business defendants demonstrated on the sidewalk in front of the bar carrying signs reading, "More Classrooms, less Taprooms," "Your children will pass here to school," and "Parkside Residents, No more taprooms here." Defendants never contended that plaintiff's business was operating in violation of the Liquor Code. Rather, they believed that the licensing of *any* liquor establishment was detrimental to their community.

In granting the injunction the court observed that the proper course of action for citizens who seek to prevent the sale of alcoholic beverages in

their communities is to hold a local election on the issue, as permitted in the Liquor Code. The placards which defendants carried incorrectly implied that the closing of plaintiff's taproom would provide revenue for more classrooms for the community. Plaintiff was, of course, unable to accomplish this objective.

In response to defendants' assertion that an injunction would violate their right of free speech the court held, 20 D. & C. 2d 440:

"The mask of freedom of speech confers no right to injure or otherwise damage another's business in this case, and any possible justification for the picketing disappears. The picketing is the result of an impudent assumption of power under the guise of the exercise of free speech and cannot be tolerated. . . . The unstated purpose of the picketing is to destroy plaintiff's business; the constitutional freedoms do not grant immunity to individuals to destroy the rights and property of others."

In the case at bar, as in Hilliard, defedants' undisguised objective is to injure Dr. Morrison's practice by encouraging the public and other labor organizations to boycott his business. In a leaflet distributed to the public on August 18, 1981, during picketing in front of plaintiff's place of business, defendants stated in part ". . . *we would like you, the public, to refrain from doing business with Dr. Morrison and his company because he has treated his employees so shabbily. . . .*" Plaintiff's Exhibit 1. Defendants also carried signs which read "Labor United For Justice—Boycott Morrison." Plaintiff's Exhibit 4. Defendants went so far as to request other Pennsylvania AFL-CIO unions to refrain from doing business with Dr. Robert J. Morrison through employe visual care benefit packages stat-

ing that "[t]here is little or no difference between Dr. Morrison and Morrison Laboratories." Plaintiff's Exhibit 10.

Nor is there any doubt that defendants' efforts to harm Dr. Morrison's business have been at least partially successful. Plaintiff's Exhibit 8 consists of a packet of 15 letters received by Dr. Morrison from either former patients or a labor official who supports the instant strike. They contain such phrases as "if you depend on my business you will be poorer than the people you are ripping off" and "I choose not to conduct any business with a firm that treats its workers so abominably."

Defendant also contends that this court lacks jurisdiction to issue an injunction against the picketers by virtue of the Labor Anti-Injunction Act of June 2, 1937, P.L. 1198, sec. 1, as amended, 43 P.S. § 206a et seq.

Section 206f of that act describes the specific instances when the courts are powerless to issue injunctions in labor disputes. Subpart (e) provides that no court can enjoin any person or group of persons from:

"Giving publicity to, and obtaining or communicating information regarding the existence of, or the facts or merits involved in, any labor dispute, whether by advertising, speaking or picketing or patrolling any public street or place where any person or persons may lawfully be, or by any other method *not* involving misrepresentation, fraud, duress, violence, breach of the peace or threat thereof." (Emphasis supplied.)

Our courts have continually held that the publication of misleading statements may properly be enjoined under the act: Callahan-Penn, Inc. v. District 65 Retail, Wholesale & Department Store

Union, supra; Davis v. McGuigan, 36 D. & C. 554 (1939); Tankin v. Hotel & Restaurant Workers Industrial Union, Local No. 356, 36 D. & C. 537 (1939); Peak v. McElroy, 33 D. & C. 556 (1938) (dicta).

The provisions of the Labor Anti-Injunction Act do not deprive this court of jurisdiction to enjoin written or oral statements of defendants which do not correctly seek to convince the public that plaintiff is responsible for the situation at Morrison Laboratories. Such assertions misrepresent the facts and may be enjoined.

Defendants also argue that by virtue of the Labor Management Relations Act of July 5, 1935, 49 Stat. 452, as amended, 29 U.S.C.A. §§158(b)(4) and 187, exclusive original jurisdiction of this action lies in the Federal district courts. This issue was laid to rest by the Federal district court on August 5, 1981, which held that neither the complaint nor the petition for removal stated a cause of action arising under Federal law because Dr. Morrison is not engaged in interstate commerce, nor is he connected with an industry affecting interstate commerce. The law is more than clear that an order remanding a case to the state court reinvests that court with jurisdiction: Act of June 25, 1948, 62 Stat. 939, 28 U.S.C.A. §1447(c).

Finally, we do not agree with defendants' assertions that plaintiff has an adequate remedy at law. The wrongful conduct by defendants has continued for approximately three years and there is no indication that without an injunction it will cease in the near future. Because plaintiff would be forced to institute additional litigation to fully protect his rights, we may properly exercise our equity jurisdiction in this case: Bright v. Pittsburgh Musical Society, 379 Pa. 335, 108 A. 2d 810 (1954).

For these reasons we find defendants' preliminary objections to be without merit and conclude plaintiff is entitled to the relief requested on the merits of the case.

## DECREE NISI

And now, November 6, 1981, after hearing, it is hereby ordered that plaintiff's request for relief is granted as follows:

(1) Defendants are permanently enjoined from picketing plaintiff and/or his profession in any form; from inducing or attempting to induce any person or organization to boycott plaintiff's business; and from suggesting or implying to the public, by any means, that plaintiff is concerned with or can control or influence their grievances against Morrison Laboratories.

(2) The site of future picketing against Morrison Laboratories at plaintiff's place of business shall be limited to Penn Street and the western boundary of the property, and no more than three persons shall be permitted to picket. Picketing shall not interfere with free access to Morrison Laboratories by its employes or by the public.

(3) Defendants' future communications concerning their labor grievance shall identify "Morrison Laboratories" as their target, and they shall not refer directly or indirectly to plaintiff individually. When written or printed, the words "Morrison Laboratories" shall be given equal prominence in size and appearance.