417 A.2d 1248

ROUSE PHILADELPHIA INC. and Redevelopment Authority of the City of Philadelphia, Plaintiffs, and Gimbel Brothers, Inc. and Gimbel Brothers Realty Corp., Intervening Plaintiffs,

v.

AD HOC '78 and T. Milton Street as an Individual and as a Representative of Ad Hoc '78 the Unincorporated Association of Persons Acting in Concert to Block Ingress to and Egress from the Gallery At Market East and John Doe and Jane Doe and all other persons acting in concert with the named participants or otherwise participating in their aid, Appellants.

Superior Court of Pennsylvania.

Argued March 12, 1979.

Filed Dec. 28, 1979.

56

58

John F. Street and George D. Gould, Philadelphia, for appellant.

Denis V. Brenan, Philadelphia, for appellee, Rouse.

Barry J. Grossman, Philadelphia, amicus curiae for appellee, City of Philadelphia.

Jacob Hart, Philadelphia, for appellee, Gimbel Bros.

Before VAN der VOORT, WATKINS and LIPEZ, JJ.

WATKINS, Judge:

This case comes to us on appeal from the Court of Common Pleas of Philadelphia County, Civil Division, and involves defendant's appeal from an Order of the court below holding him in civil contempt of court. Defendant was also fined Five Thousand ($5,000.00) Dollars which fine was made payable to the City of Philadelphia within six (6) months.

On August 25, 1978, the defendant, T. Milton Street, and a large group of persons estimated to be from three to five thousand (3000 to 5000) strong, massed at various locations in and around the entrances to a downtown shopping mall in Center City Philadelphia known as The Gallery. They also converged on Gimbels Department Store located in the same area. Ingress and egress to both The Gallery and Gimbels was rendered difficult and, at times, impossible, by the group's activities.

The defendant and three to five hundred (300 to 500) of the demonstrators then entered The Gallery and marched throughout the mall shouting in loud voices and bringing business therein to a virtual standstill. The defendant spoke to the throng with the aid of sound amplification equipment and urged a boycott of the businesses in the mall.

A temporary restraining order was promulgated by the court below on August 26, 1978, and on January 31, 1979, the court below entered an order enjoining the defendant and the persons acting in concert with him from "picketing, handbilling, speechmaking, demonstrating, and boycotting inside or outside The Gallery or Gimbels . . ." The court defined the area from which defendants were enjoined from engaging in the aforesaid activities as "the public areas therein [The Gallery and Gimbels], or any of the three colonnades located outside the entrance to Gimbels, or the exterior courtyard area, or the sidewalk which forms the immediate perimeter surrounding The Gallery, Gimbels and Strawbridge Store."

On February 22, 1979, the defendant and thirty-seven (37) other persons were arrested at The Gallery for allegedly violating the January 31, 1979 injunction decree. A hearing was then held at which witnesses testified that: Street and two hundred and fifty (250) to three hundred (300) people had congregated on the northeast corner of 10th and Market Streets in Philadelphia, in front of The Gallery and Gimbels; they also had congregated on the sidewalk and in the colonnades area of the mall; the group shouted and blocked the entrance to The Gallery and Gimbels; because they stood close together they were successful in preventing people from entering the stores; that during the incident members of the defendant's group chanted and shouted "boycott" to persons attempting to enter The Gallery; that a police officer, who had been empowered to enforce the court order enjoining the demonstration gave the defendant Street and his attorney copies of the January 31, 1979 order; that an officer then read the court order to the group using sound amplification equipment but the group continued to shout and chant "boycott" as the order was read to them; and that after giving the group five minutes to disburse the police arrested defendant Street and thirty-seven (37) of his followers. At the hearing defendant Street was given the opportunity to address the court and informed the court that despite the court order he intended "to go back to The Gallery tomorrow".

On February 23, 1979, defendant Street went to The Gallery again and led a group of demonstrators onto the northeast corner of 10th and Market Streets. After being notified of the defendant's actions the court ordered the arrest of persons violating the January 31, 1979 Order. Street was one of the persons arrested. A hearing was held at 1:30 P.M. on February 23, 1979. Testimony adduced at the hearing revealed that at 11:20 A.M., the defendant led a group of thirty-five (35) protestors to the northwest corner of 10th and Market Streets then crossed the intersection. The group was shouting "boycott, boycott" throughout the incident. As the police attempted to read the court order of January 31, 1979 to them, the group marched east on the north side of Market Street for a distance of approximately twenty (20) feet then turned around and marched back to the northeast corner. This area lies in front of The Gallery. The defendant then led his group to a SEPTA boarding island which runs east to west in the 900 block of Market Street on the north side and is about twenty (20) feet from the sidewalk. During this period the group continued to chant "boycott, boycott, boycott The Gallery", which chanting was clearly audible to persons located at the entrances to and on the sidewalk in front of The Gallery. At this point defendant and his followers were arrested.

After the hearing, the defendant was found in civil contempt of court and was committed for ninety (90) days, conditioned upon his right to purge himself of the contempt by assuring the court that he would, in the future, abide by the court order until such order was vacated or stayed. He was also fined Five Thousand ($5,000) Dollars. On February 26, 1979, Street filed an appeal to this Court.

Defendant's first argument is that the court order prohibiting the "picketing, handbilling, speechmaking, demonstrating and boycotting of The Gallery" constituted an unconstitutional violation of defendant's First Amendment rights of freedom of speech and expression. Defendant's brief states at length defendant's belief that certain federal monies used in the construction of the downtown shopping

mall should have been used instead to provide for low-income housing for residents of North Central Philadelphia. Defendant also claims that his protest was justifiable because he was protesting the fact that only one business in the mall was black owned. Defendant claims that since The Gallery is owned by The Redevelopment Authority of Philadelphia (RDA) that his boycott was one of a public building. However, the RDA leased the mall to Rouse Corporation for ninety-nine (99) years and Rouse, in turn, rents individual space within the mall to ninety-four (94) private owners. Thus, it is apparent that The Gallery is indeed comprised of ninety-four (94) private businesses and boycotting or picketing of it constitutes the boycotting or picketing of private business. Gimbels and Strawbridge and Clothier are private businesses and own the buildings adjacent to the mall in fee simple. Under such circumstances we find that the demonstrations in question were clearly directed at private businesses.

Defendant also argues that the court order was not lawful because the objective of the boycott was "to communicate a message to government regarding the expenditure of public monies". At the various hearings held on this matter it was shown that: the demonstrators shouted and chanted so loudly that normal conversation was impossible anywhere in the vicinity; that the group occupied virtually all of the walkways, stairs, and escalators in The Gallery; that the demonstrators carried umbrellas and signs which they brandished in a vigorous fashion; that a group of the demonstrators sat down and sprawled in the walkways of The Gallery and in the "Market Fair" area of the mall which is an area containing approximately twenty (20) fast food restaurants in the western end of the mall; that when so situated they listened to and gave speeches over amplifying equipment and stood on tables in the restaurants thereby denying patrons of ingress and egress to the area; that as a result of this activity shops in the mall closed, patrons left the area and business in the mall and other stores was brought to a virtual standstill. It was also shown that on

certain occasions during the demonstration several demonstrators had entered a McDonald's restaurant in the mall and had told patrons that the food was horsemeat and had maggots in it. At a bakery in the mall (Tiffany's) disparaging remarks about the quality of food were also made to the store's patrons and one demonstrator stuck her finger in her nose and then touched the produce. Several demonstrators had engaged in violent incidents during the picketing. One demonstrator, a Terrence Potter, had tripped the owner of the bakery during a demonstration. A group of demonstrators then gathered in front of the bakery and shouted obscene comments and racial slurs at the owner. Potter had also threatened to beat up another merchant in the mall. Another demonstrator, Harry Miller, had threatened to break a merchant's jaw. A group of demonstrators also threatened an elderly female patron of the mall telling her to get out of there "while she could still walk". The demonstrators also ignited a number of fires throughout the mall by igniting the refuse in trash receptacles located throughout the mall. It was also proven that Street had forged a copy of the court order of October 6, 1978 and had distributed copies of the forged order throughout the throng. The forged document distorted the court order so as to convey the impression that it was leafletting material. Street and other demonstrators had given several speeches in which they stated that the purpose of the demonstration was to bankrupt merchants in The Gallery and Gimbels. They also demanded "reparations" from Rouse, Gimbels and the other merchants. They demanded that appellees pay money to black, Spanish-speaking and poor white neighborhoods as "reparations" for the money spent by the Redevelopment Authority on the mall.

█ Appellant's contention that he did not violate the January 31, 1979 order of court is patently frivolous. Street claims that by moving the demonstration from The Gallery and Gimbels to the medial strip of Market Street, about twenty feet (20) away from the proscribed area, he complied with the court order. On February 22, 1979, Street and his

followers picketed and demonstrated on the sidewalks outside The Gallery, Gimbels and Strawbridge and Clothier in direct defiance of the court order. The fact that they later moved to a location twenty (20) feet away from the sidewalk does not alter the fact that they directly violated the order by demonstrating on the sidewalk outside The Gallery. In fact Street had stated in open court that he intended to go back to The Gallery despite the order. To argue now that he was not aware of the scope of the court order and did not knowingly violate it extends the imagination to incredible limits. We find that Street and his followers did indeed violate the court order of January 31, 1979 on February 22 and February 23, 1979.

Appellant also contends that the court order was unconstitutional because it was overly broad and because it violated appellant's right to freedom of expression. The value to an open society derived from the free flow of ideas is self-evident. For that reason courts have been loathe to sanction any measure which infringes upon a person's right to communicate his ideas. Pure speech therefore is a right which is to be zealously preserved in our society. However, as a person's activities move away from *pure speech* and into the area of expressive *conduct* they require less constitutional protection. As the mode of expression moves from the *printed page* or from *pure speech* to the commission of public *acts* the scope of permissible regulation of such expression increases. See *U. S. v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); *Commonwealth v. Winkleman*, 230 Pa.Super. 265, 326 A.2d 496 (1974). It should be noted that in our case the very purpose of the court order was not to limit the *expression* of the *ideas* appellants were attempting to communicate but was to limit the *conduct* by which the appellants chose to communicate their ideas. It is apparent that in a highly technological, civilized society a person or group of persons cannot justify participation in any type of conduct, without any limits at all, merely because they allege that their conduct has a higher, symbolic purpose which, they allege, brings it within the ambit of

protection afforded to free speech. The closing of private business by blocking the entrances thereto with the avowed purpose of bankrupting those businesses, loud abusive language including the use of obscenities and racial slurs, physical intimidation of patrons and store owners, and the setting afire of trash receptacles in a densely populated, downtown, commercial area are all activities which cannot be justified by the appellants' claims that they did these things in order to protest the allocation of government funds to one area rather than to another. Certainly neither the businesses in The Gallery nor their owners have the power to direct the city to allocate more funds to other areas. Nor can they effectively bring about the ownership of more businesses by blacks. What appellants seem to be saying here is: "if we cannot obtain government funding for our projects then we will destroy those projects which do receive such funding", and "if members of our racial group do not own as many businesses as we think they should own then we will bankrupt businesses owned by others". Appellants then clothe their attempts to destroy the businesses and other governmental projects under the guise of free speech. Of course, appellants have every right to lobby for the benefits of government largesse. However, threatening to do harm to third parties is not a legitimate means of expressing their desire for a greater share of government monies. As the court below pointed out:

"The slaughter of 11 athletes at Munich as a supposed symbolic and political protest was certainly murder as to the men killed and was by any civilized standard an unacceptable barbarism. In the lesser degree (and absent personal violence) the slaughter of 96 private businesses as a supposed symbolic protest against government conduct is an unacceptable assault upon 5th and 14th Amendment rights to engage in and conduct a business, to work for a livelihood and to hold and use private property."

The court went on to classify appellants' activities as a form of "scapegoat boycotting" which it defined as that boycotting which:

". . . urges concerted refusal to have business relationships with a 'target' consisting of a limited number of persons, for the purpose of protesting against and symbolizing protest against actions and conduct of third parties, although the 'target' has no relationship to or involvement in or any control over or power to affect the primary disputes between the protestors and third parties. As to the 'target' the sole purpose of the boycott is to cause damage, injury and destruction for symbolic purposes. In a true scapegoat boycott the 'target' has no power or authority to force concessions from third parties. In a true scapegoat boycott there is no real or bona fide dispute, primary or secondary, between the 'target' and the boycotter."

As discussed above the "targets" of appellant's boycott have no power to alter the present formulas for the distribution of government largesse throughout the City of Philadelphia. Therefore, there is no real dispute between the protestors and the merchants in The Gallery, Gimbels or Strawbridge and Clothier. Unlike the "sit-in" demonstration cases which arose out of "sit-ins" in lunch counters in the South during the 1950's and 1960's the "targets" in our case are not enforcing any discriminatory laws, do not refuse to allow persons to patronize their establishments nor refuse employment to anyone because of racial, ethnic, or religious differences. Thus, this case is readily distinguishable from the sit-in cases such as *Brown v. Louisiana*, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) and *U. S. v. Miller*, 367 F.2d 72 (2d Cir. 1966) cert. denied at 386 U.S. 911, 87 S.Ct. 855, 17 L.Ed.2d 787, cited by appellant. The fact that blacks do not own more businesses in The Gallery than they do has nothing to do with any racially discriminatory laws nor, more importantly, with any actions of the "target". For these reasons we do indeed find that the "targets" in our case were the victims of so-called "scapegoat boycotting". The question remains, however, as to whether "scapegoat boycotts" are illegal.

■ In a free society no one may force another to refrain from patronizing a particular, lawfully administered business establishment by unlawful means. Certainly a person or group of persons may attempt to convince others to purchase a certain product or to refrain from purchasing certain products whatever their reason. The question is to what extent may one go in attempting to convince others not to patronize certain establishments? Put another way the question is: "To what extent may the state go in limiting a group's boycott of private business?". The answer is that picketing (which involves actions as well as speech and therefore is subject to more regulation than pure speech) in order to enforce a boycott which is conducted for a purpose contrary to law is unlawful in itself and may be restrained. *Hughes v. Superior Ct.*, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950); *1621, Inc. v. Wilson*, 402 Pa. 94, 166 A.2d 271 (1960). In *Hughes v. Superior Ct.*, supra, the court stated that:

> "It has been amply recognized that picketing, not being the equivalent of [free] speech as a matter of fact, is not its inevitable legal equivalent. Picketing is not beyond the control of a state if the *manner* in which the picketing is conducted or the *purpose* which it seeks to effectuate gives ground for its disallowance . . . We cannot construe the due process clause as precluding California from securing respect for its policy against involuntary employment on racial lines by prohibiting systematic picketing that would support such policy. See *Giboney v. Empire Storage & Ice Col.*, supra [336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834]." (Emphasis added) 339 U.S. at 465–66, 70 S.Ct. at 721–22.

In *Hughes, supra*, a group of protestors had conducted boycotts of a certain business establishment which allegedly did not employ blacks in the same ratio as the business's clientele. In holding that racially-oriented employment practices were contrary to the State of California's public policy the Court upheld the state court's ban on the systematic picketing of the establishment which picketing sup-

ported the proscribed practice. In *American Radio Association v. Mobile Steamship Association*, 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974), members of a maritime union peacefully picketed and distributed leaflets at a public dock which urged people to "Ship American". Unlike our situation in the instant case the demonstrators were peaceful and nonviolent. Upon petition of certain third parties the state court enjoined all of the demonstrators' activities at the dock which was owned by the State of Alabama. The Supreme Court upheld the trial court's ban on the picketing reasoning that the demonstrators' activities were done, in part, with the intention of interfering with business at the state dock. Since tortious interference with business at the public dock was unlawful the picketing on the dock was unlawful and its ban was upheld.

In our case, as in *American Radio Association*, supra, the protestors conduct constituted a tortious interference with business relations. One has a right to pursue his business relations free from interference on the part of other persons except where such interference is justified or constitutes the exercise of an absolute right. *Birl v. Phila. Electric Co.*, 402 Pa. 297, 167 A.2d 472 (1960); *Restatement, Torts, Section 766.* As discussed above, the right to picket is not absolute because it involves actions as opposed to pure speech. Since the 'targets' of the picketing and boycott were "scapegoats" because they did not possess the power to grant the concessions demanded by the demonstrators we find that the injunction issued by the court below which restrained the picketing and boycotting of The Gallery, Gimbels, and the Strawbridge store was lawful. In addition the court below reasoned that the protestors' activities directed against the "targets" coupled with their demands that the "targets" pay "reparations" to blacks and other minorities constituted an act of extortion. The court also found that the activities of appellant and his followers were aimed at interfering with the effectuation of the Commonwealth's public policy to promote the public health, safety and welfare of its citizens and to eliminate blighted areas.

For all of these reasons appellants' activities in picketing the proscribed areas were conducted at least in part for purposes contrary to state law, i. e. extortion, tortious interference with business relations, and interference with the Commonwealth's public policy of promoting the health, safety and welfare of its citizens.

Appellant argues that most of the cases in which picketing has been enjoined were cases involving picketing by labor unions and attempts to distinguish his situation on that basis. We can find no precedent (nor is any such precedent cited by appellant) which holds that non-labor picketing enjoys greater constitutional protection than labor picketing. We note that *Hughes v. Superior Ct.*, supra, is a case in which the Supreme Court upheld an injunction against non-labor picketing. It is therefore, apparent that non-labor picketing may be enjoined if it is done, for an unlawful purpose and an injunction is proper if only part of the demonstrators objects in picketing is unlawful. *Anchorage, Inc. v. Local 301, A. F. L.*, 383 Pa. 547, 119 A.2d 199 (1956). We, therefore, reject appellant's argument and hold that the court below acted properly in enjoining the picketing of The Gallery, Gimbels and Strawbridge and Clothier. The appellants' activities in yelling obscenities into the ears of patrons who refused to submit to appellants' directives to refrain from patronizing the "targets", the setting of fires in the trash receptacles in the indoor mall, the use of amplification equipment to broadcast obscenities at passersby, the threats to set afire certain stores, the extending of their arms in order to block people from entering the stores, the continued trespass on private property (Gimbels) and the directing of racial slurs to white and to black employees of the area who refused to join in their activities constitutes conduct which is violent, abusive and illegal. Appellant Street's avowed intention of disobeying the court order coupled with the record of the protestors' activities during their demonstrations certainly justified the court's order enjoining any future demonstrations at the target areas. Because the purpose of the appellants' activities was unlaw-

ful and because the record indicates a pattern of violent, abusive behaviour during the demonstrations we hold that the court below was justified in enjoining any such future demonstrations.

▪ Appellant's argument that the court order constituted an unlawful prior restraint on free speech is also devoid of merit. In the instant case a full and complete hearing had been held and the conduct enjoined, although expressive conduct and therefore afforded some First Amendment protection, was correctly found to be unlawful. Thus, appellant has had the benefit of a full and complete hearing prior to the entry of any order proscribing his conduct. As such the court's order is not an impermissible prior restraint on free speech. See *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1964).

▪ Appellant's argument that the January 31, 1979 order is overbroad is also meritless. Since the picketing in our case was done for an unlawful purpose and in a violent, unlawful manner which in and of itself may have constituted a breach of the peace we hold that the court below acted correctly when it prohibited all such activities at the target areas. Nor is the order vague as claimed by appellant. A reading of the order clearly indicates that it specifically enjoined certain activities (picketing, handbilling, etc.) in certain specific areas.[1] Only an illiterate could fail to understand its scope.

▪ Appellant argues that T. Milton Street was not obligated to obey the January 31, 1979 order. This argument is also meritless. Parties must obey a preliminary

1. "1. Defendants, T. Milton Street and Ad Hoc '78, together with their agents, servants and those acting in their interest or at their direction, are enjoined and restrained preliminarily, until final hearing, and thereafter until further order of this court, from picketing, handbilling, speechmaking, demonstrating, and boycotting inside or outside The Gallery or Gimbels, including the public areas therein, or on any of the colonnades located outside the entrance to Gimbels, or the exterior courtyard area, or the sidewalk which forms the immediate perimeter surrounding The Gallery, Gimbels and Strawbridge' stores."

injunction, even if invalid, if the order is entered by a court with jurisdiction over the subject matter of the order and the parties theretoi unless the order is vacated or reversed. *Horne v. Internation Union of Operating Engineers*, 250 Pa.Super. 145, 378 A.2d 868 (1977). The January 31, 1979, order was neither vacated nor reversed and we have held that the order was properly entered. T. Milton Street conspicuously violated the January 31, 1979 order on February 22, 1979 and February 23, 1979. In fact he announced in open court that he would not abide by the order. Therefore, it is readily apparent that the order applied to T. Milton Street and that he violated said order.

 It is axiomatic that courts have always possessed the inherent power to enforce their orders and decrees by imposing sanctions for failure to comply with said orders. *In re: Martorano*, 464 Pa. 66, 346 A.2d 22 (1975); *Rule 1529(c), Pennsylvania Rules of Civil Procedure*. Contempt of court is divided into two classes: (1) civil contempt and (2) criminal contempt, (a) direct contempt and (b) indirect contempt. *Brocker v. Brocker*, 429 Pa. 513, 241 A.2d 336 (1968). Direct criminal contempt involves those contumacious acts committed in the presence of the court. *Knaus v. Knaus*, 387 Pa. 370, 127 A.2d 669 (1956). The distinction between criminal contempt and indirect civil contempt lies in the judicial response to the contumacious acts and the judicial responses are classified according to the dominant purpose of the court in issuing the order. If the dominant purpose of the court is to punish an offender for past contumacious acts in disobedience to a court directive then the contempt is criminal. If the purpose of the court is to coerce the contemnor to comply with the court directive then the contempt is civil contempt. Several factors indicative of civil contempt are:

(1) where the complainant is a private person as opposed to the government or a governmental agency; (2) where the proceeding is entitled in the original injunction action and filed as a continuation thereof as opposed to a separate and independent action; (3) where holding the de-

fendant in contempt affords relief to a private party; (4) where the relief requested is primarily for the benefit of the complainant; and (5) where the acts of contempt complained of are primarily civil in character and do not of themselves constitute crimes or conduct by the defendant so contumelious that the court is impelled to act on its own motion."

*Philadelphia Marine Trade Association v. International Longshoremen's Association,* 392 Pa. 500, 140 A.2d 814 (1958). It is apparent that the contempt in the instant case was indirect civil contempt. The complainant in the case is the Rouse Corporation, a private entity. The matter consisted of a series of hearings and court orders. The contempt proceedings were entitled in the original injunction action and filed as a continuation of said action. The relief requested was solely for the benefit of private parties, namely, Rouse, The Gallery merchants, Gimbels and Strawbridge and Clothier to protect them from unlawful interference with their businesses. Holding the defendant in contempt would afford relief to the private parties by preventing the unlawful picketing of their establishments. Finally, the acts committed by defendant Street were not by their nature so contumacious that the court was compelled to find Street in contempt on its own motion (although certain of the acts committed by other demonstrators during the incidents may very well have been criminal in nature). Thus, it is clear that the contempt in our case was civil in nature. The fact that the court ordered the Sheriff's Office to enforce the order does not change the nature of the contempt.

 Subjugation to confinement for civil contempt must provide a condition with which the contemnor is capable of complying and which has the effect of purging the contemnor of the contempt if he complies with it. *Simmons v. Simmons,* 232 Pa.Super. 365, 335 A.2d 764 (1975). The court may, however, impose an unconditional fine upon a contemnor which may be payable to the United States or the Commonwealth or to the County, or to the private parties who have been injured. *Brocker v. Brocker,* supra; *U.S.V.*

*U.M.W.*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). An unconditional fine can serve two purposes: (1) to punish violators or (2) to deter future or continued violations of the law. *Mastrangelo v. Buckley*, 433 Pa. 352, 250 A.2d 447 (1969). The deterrence of continuous or future violations of a court order is a legitimate interest to be served by the levy of an unconditional fine. In this case the fine was made payable to the City of Philadelphia which had been forced to spend upwards of $1,400,000 in attempting to ensure compliance with the court order. Of this amount approximately $400,000 represents the overtime costs to police and Sheriff's deputies which otherwise would not have been incurred. Such costs were necessarily incurred because of the potentially violent situations created by the protestors. The court below made specific findings to that effect. Where an unconditional fine is imposed which is made payable to the governmental unit required to enforce the court order and to encourage future compliance to the benefit of the aggrieved private parties it should be sustained. *N.L.R.B. v. J. P. Stevens Co., Inc.*, 563 F.2d 8 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765. For these reasons we hold that the court below acted properly in finding appellant in civil contempt of court and that the $5,000 fine imposed upon him was lawful.

Appellant's final contention is that the court below failed to provide him with the required due process guarantees before finding him in contempt of court. Specifically, appellant argues that before he could be held in indirect civil contempt a rule to show cause why an attachment should not issue, an answer thereto, a hearing, a rule absolute, a hearing on the contempt citation, and an adjudication of contempt had to be held citing *Altemose Construction Co. v. Building and Trades Council of Phila.*, 449 Pa. 194, 296 A.2d 504 (1972). In *Altemose*, supra, the contempt proceedings were initiated for disobedience of a preliminary injunction entered ex parte. The error in that case was the lack of opportunity for appellants to be heard on the propriety of the court order for which they were held in contempt prior

to the initiation of contempt proceedings. However, the above-mentioned multi-step contempt procedure is clearly not applicable to a situation in which the attachment and contempt proceedings are predicated upon the violation of an order or decree which has been entered *after* a full hearing and which have been served upon the contemnor. These initial procedures are obviously redundant when the contemnor is already in custody by attachment pursuant to *Pennsylvania Rule of Civil Procedure 1529(c)*, as was the situation in the instant case. See *Commonwealth ex rel. Magaziner v. Magaziner*, 434 Pa. 1, 253 A.2d 263 (1969). We hold that contempt proceedings which are predicated upon the violation of an order which has been served on the contemnor and entered after a full hearing on the merits thereof may be commenced by attachment, and due process requires no more than notice of the violations alleged and opportunity for explanation and defense. *Riccobene Appeal*, 439 Pa. 404, 268 A.2d 104 (1970). In the instant case appellant was given the opportunity to be heard prior to the issuance of the order and even if we were to hold that the *Altemose* multi-step procedure applied to this situation we would hold that appellant had been provided with the procedural safeguards guaranteed therein as the court below conducted three hearings at which appellant had the opportunity to be heard prior to holding appellant in contempt of court.

Appellant's argument that insufficient evidence was adduced at the hearing below in order to find him in contempt of court is fatuous. He claims that his activities conducted on the medial strip outside of The Gallery were not a violation of the court order. Whether or not the order proscribed the boycott activity on the medial strip is irrelevant because sufficient evidence was produced to show that he conducted the boycott activities in violation of the January 31, 1979 order immediately outside The Gallery and Gimbels on the northeast corner of 10th and Market Streets, in Philadelphia, prior to moving to the medial strip. This clearly was the area at which such activities had been

enjoined. Therefore, we hold that sufficient evidence was adduced at the hearing held by the court below from which appellant could be adjudged to be in violation of the January 31, 1979 order.

Orders affirmed.