552 A.2d 677

David KLEBANOFF, M.D., Appellee,

v.

Michael McMONAGLE, Joseph Wall, Howard Walton, Thomas McIlhenny, Pasquale Varallo, John Stanton and Patricia McNamara, Appellants.

Superior Court of Pennsylvania.

Argued Sept. 14, 1988.

Filed Dec. 23, 1988.

Reargument Denied Feb. 1, 1989.

Thomas J. Short, Oreland, for appellants.

David I. Bookspan, Philadelphia, for appellee.

Before OLSZEWSKI, DEL SOLE and JOHNSON, JJ.

DEL SOLE, Judge:

This is an appeal of a permanent injunction preventing defendants and others with notice from picketing or demonstrating in the street directly in front of the home of Appellee, Dr. David Klebanoff. Appellants are members of the "pro-life" movement, who had picketed for almost a

year in front of Dr. Klebanoff's home where he lives with his wife and young son.

A temporary injunction was issued by the Court of Common Pleas of Montgomery County in April, 1987 and a preliminary injunction by the same court was entered in October, 1987. In March, 1988 the court entered a final decree ordering a permanent injunction finding that limiting the defendants' conduct was necessary to prevent immediate and irreparable harm, that greater injury would occur by refusing the injunction than granting it, and that the Klebanoffs had no adequate remedy at law.

On appeal, the picketers have challenged the injunction as violative of their rights under the First and Fourteenth Amendments of the U.S. Constitution and under Article 1, Section 7 of the Pennsylvania Constitution. They also argue that this decree is an abuse of the trial court's discretion because of these constitutional transgressions.

In this case of first impression, we hold that courts of this Commonwealth can enjoin activity which violates an individual's residential privacy, and that the injunction in this case, which restricts the place where the expressive activity can occur, is a proper time, place and manner restriction. Therefore, the injunction is permissible under both the United States and Pennsylvania Constitutions. We further hold that, given the particular facts of this case, the entry of this decree was not an abuse of the trial court's discretion.

Although both the Pennsylvania and United States Constitutions protect the right of individuals to disseminate their views on religious, political and ethical matters, "even protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 799, 105 S.Ct. 3439, 3447, 87 L.Ed.2d 567 (1985). It is well-settled that, under the First Amendment, expressive activity may be subject to reasonable time, place and manner restrictions. *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981).

The more difficult question is what constitutes a reasonable restriction on the exercise of First Amendment Rights. A number of doctrines have developed in constitutional jurisprudence which are used in scrutinizing the reasonableness of a given restriction and which require balancing First Amendment rights and their elevated position in the hierarchy of protected values with the legitimate interests of government or individual civil rights. A recent decision of the Supreme Court, *Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), employed those traditional doctrines in upholding the constitutionality of a city ordinance banning picketing aimed at a private residence in the face of a similar First Amendment challenge by anti-abortion activists who were picketing a doctor's home. This precedent provides strong support for our decision in this case. We will apply the *Frisby* analysis in scrutinizing the injunction permanently barring Appellants from picketing on the street directly in front of Dr. Klebanoff's residence.

We start with the long-established doctrine that public streets and sidewalks, "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. C.I.O.,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). The standards by which limitations on speech must be evaluated differ depending on the character of the property at issue, and public streets have been typically referred to as the archetype of a traditional public forum, *Perry Education Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983). The Supreme Court recently emphasized in *Frisby* that all streets, including residential streets and sidewalks, are public fora, *Frisby,* 108 S.Ct. at 2500, and the right to use these fora for public assembly and discourse may be limited only for weighty and substantial reasons. *Grayned v. City of Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). In this quintessential public forum, injunctions which effect the time, place and manner of expression are proper if they are content-neutral, are

narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983).

The injunction here bans all picketing of Dr. Klebanoff's house without reference to the content or subject matter of the protest. The injunction contains no invitation to subjective or discriminatory enforcement, and is therefore, under all settled criteria, content-neutral, *Grayned*, 408 U.S. at 113, 92 S.Ct. at 2302.

Furthermore, this injunction serves to protect a substantial interest recognized in both Pennsylvania law, *Hull v. Curtis Publishing Co.*, 182 Pa.Super. 86, 95, 125 A.2d 644 (1956), and in the United States Constitution, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). It protects what has been variously called the individual's right of privacy, the right to be free from intrusion upon one's solitude or seclusion, or the right to be left alone. *McMullan v. Wohlgemuth*, 453 Pa. 147, 308 A.2d 888 (1973) (protection of the privacy of welfare recipients); *Harris by Harris v. Easton Pub. Co.*, 335 Pa.Super. 141, 153, 483 A.2d 1377 (1984), (discusses the adoption in Pennsylvania of the Restatement of Torts, 3rd § 652b, concerning intrusion on seclusion); *F.C.C. v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978), (discussing the right to be left alone in the privacy of one's own home).

The public's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order, *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980). The home has been called "the last citadel of the tired, the weary, and the sick," *Gregory v. Chicago*, 394 U.S. 111, 125, 89 S.Ct. 946, 954, 22 L.Ed.2d 134 (1969). The home serves to provide, among other things, a refuse from today's complex society where we are inescapably captive audiences for many purposes. *Rowan v. United States Post Office*, 397 U.S. 728, 738, 90 S.Ct. 1484, 1491, 25 L.Ed.2d 736 (1970). Normally, outside of the home, conso-

nant with the Constitution, we expect individuals to avoid unwanted speech, "simply by averting [their] eyes." *Cohen v. California,* 403 U.S. 15, 21, 91 S.Ct. 1780, 1786, 29 L.Ed.2d 284 (1971). But such avoidance within the walls of one's own house is not required. Therefore, the courts have repeatedly held that individuals are not required to welcome unwanted speech and the State may act to avoid such intrusions into the privacy of the dwelling place, *Frisby,* 108 S.Ct. at 2502.

The trial court found that picketing started on a Sunday afternoon with twenty to thirty people parading up and down the sidewalk within five feet of where Dr. Klebanoff was sitting. They carried signs stating among other things, that "Dr. Death Lives Here." The picketers shouted comments to Dr. Klebanoff, and at least one attempted to taunt him into a physical confrontation. Neighbors began to gather because of the commotion and Dr. Klebanoff's son was awakened from his sleep. Mrs. Klebanoff kept their son inside with the shades drawn, despite the beautiful weather because of the picketing.

Many other Sunday afternoon demonstrations followed this first incident and they involved usually five to seven police officers who were dispatched because of the volatility of the situation. This culminated in December, 1987 when Mrs. Klebanoff, who was home alone preparing for a holiday meal, noticed a strange automobile parked outside her house for 15–20 minutes. She was nervous and afraid and telephoned her neighbors and her husband to come to her aid. Her husband returned to find about forty people, protestors, neighbors and police, congregated outside the house, and a television reporter came to the door. Mrs. Klebanoff became so emotionally distraught that she could not prepare her holiday meal, and the police advised that her guests should arrive an hour later than planned because of the protestors. Mrs. Klebanoff became afraid to remain at home alone on Sundays and felt compelled to leave her house for the sake of her son, and her own emotional stability when no one else was in the house. Dr. Klebanoff was fearful that the demonstration would turn violent,

because of threats he had received. In general, as the trial court stated, the protestors, "succeeded in their express aim to create a crisis in Dr. Klebanoff's life." (T.C. Memo at 8).

The presence of the protesters also affected the life of the Klebanoff's neighbors who experienced, among other things, police escorts and questioning when driving along the street in front of their homes, requests by the police to remove their children from their play areas because of the picketers, protestors reaching into their car windows and calling Dr. Klebanoff a baby killer, and general chaos resulting in restricted activity for themselves and their families.

■ In sum, the trial court found that the picketing at the home of Dr. Klebanoff on numerous Sunday afternoons intruded upon the privacy of the Klebanoff household to an enormous degree. The devastating effect of the targeted picketing on the quiet enjoyment of their home was documented by their own testimony and the testimony of their friends and neighbors. The U.S. Supreme Court has stated, "The tensions and pressures may be psychological, not physical, but they are not, for that reason, less inimical to family privacy and truly domestic tranquility." *Frisby*, 108 S.Ct. at 2503. The picketers avowed purpose, to create a crisis in Dr. Klebanoff's life, (N.T. at 79, June 16, 1987) caused emotional stress not only to Dr. Klebanoff, but to his wife as well. They interfered with family holidays and family routines, waking their son from his daily nap and forcing the parents to keep the child inside in fine weather to avoid the picketers. The family is figuratively, and perhaps literally, trapped within the home, and held captive. "The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Frisby*, 108 S.Ct. at 2503. Even a complete ban on all expressive activity in a traditional public forum is permissible if substantial privacy interests are being invaded in an essentially intolerable manner. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 210, 95 S.Ct. 2268, 2273, 45 L.Ed.2d 125 (1975). Such an intolerable invasion of the substantial individual interest in

residential privacy exists here. Therefore, the injunction barring all picketing on the public street in front of the Klebanoff residence is permissible under the constitution.

It remains to be determined whether the court's order is narrowly tailored and whether it leaves open ample alternative fora for the Appellants to communicate and disseminate their message.

An injunction is narrowly tailored to protect a significant public interest when its scope does not exceed that which is necessary to protect the interest involved. The permissible scope of the restriction also depends on where, in the spectrum from conduct to pure speech, the speech in question lies. As this court has stated in *Rouse Philadelphia Inc. v. Ad Hoc '78*, 274 Pa.Super. 54, 64, 417 A.2d 1248 (1979):

> As a person's activities move away from *pure speech* and into the area of expressive *conduct* they require less constitutional protection. As the mode of expression moves from the *printed* page or from *pure speech* to the commission of public *acts* the scope of permissible regulation of such expression increases.

For example, the Supreme Court overturned an injunction enjoining a community organization from distributing leaflets and pamphlets criticizing the real estate operations of a particular realtor as involving an impermissible restraint on First Amendment rights. *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). In *Austin*, where pamphletting was involved, the Court would not countenance such a restraint although it was claimed that the pamphlets invaded the realtor's privacy. The Court would not even evaluate the injunction to determine whether it was a reasonable regulation of protected speech because the injunction in question constituted prior restraint on the distribution of printed materials. Thus, the Supreme Court has been especially hostile to regulating the publication or distribution of printed or written materials because these are seen to be closer to pure speech.

In contrast, the Supreme Court affirmed the constitutionality of a regulation of the National Park Services forbid-

ding overnight camping in Lafayette Park and the Mall although those wishing to protest the plight of the homeless claimed that the overnight sleeping was not simply conduct but symbolic expression and entitled to First Amendment protection. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The Supreme Court also upheld a municipal ordinance which banned picketing outside school property when school was in session against a challenge by minority students who were picketing to protest alleged racial discrimination, *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). The closer the regulated activity is to conduct rather than to pure speech, the wider the scope of permissible regulation. If the expressive conduct comes into conflict with another legitimate public interest such as peace and order in the public parks and near school buildings, or an individual's right to privacy, the reasonableness of the regulation limiting First Amendment rights will be scrutinized for its constitutionality.

Unlike *Austin*, where the distribution of printed material was banned, here the lower court enjoined picketing, which the Supreme Court has typically held to be in the nature of expressive conduct. Moreover, when regulating such expressive conduct, the Court in *Grayned* held that, "The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place or manner that are reasonable." *Grayned*, 408 U.S. at 116, 92 S.Ct. at 2303. Given the character of the neighborhood, with its single-family houses and the pattern of normal activities which occur in this area, the injunction banning picketing in front of the Klebanoff's is narrowly tailored because it does no more than protect the privacy of the Klebanoff's family life. It permits them and their neighbors to continue their normal activities with their families and restores to them the normal enjoyment of their homes.

Much broader restrictions on expressive activities have been validated in the past for far less intrusive activities on far less substantial rights than the right to enjoy privacy in one's own home. For instance, in *Members of City Council*

*v. Taxpayers For Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Court upheld a municipal ordinance prohibiting the posting of signs on public property in the interest of eliminating visual blight. Again, in *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the Court held a city's prohibition of political advertising on buses constitutional because such advertising interfered with the city's interest in rapid, convenient and pleasant transit, (although commercial advertising was permitted). In this case, given the Commonwealth's substantial interest in protecting the use and enjoyment of one's own home, the injunction does no more than target the exact source of the evil it seeks to remedy. *Frisby,* 108 S.Ct. at 2502.

Because the First Amendment does not mean that speech may be *completely* suppressed by a time, place or manner restriction, even if it is narrowly tailored to protect a substantial interest, we must always determine if there are ample alternative means of communication. In fact, our Supreme Court in *Hibbs v. Neighborhood Organization to Rejuvenate Tenant Housing,* 433 Pa. 578, 252 A.2d 622 (1969), overturned an injunction barring protesters from picketing the home of Charles Hibbs as violative of the picketers' First Amendment rights because, as the court stated, Hibbs conducted his real estate business in such a secretive manner that no other place was available for the protestors to communicate their views. As Justice Roberts stated in his concurrence, "[T]his is not a true case of residential picketing (since no other place was available where appellants could effectively communicate), the question of to what extent purely residential picketing may be proscribed is not before us." *Id.,* 433 Pa. at 581, 252 A.2d 622. The lack of an alternative situs for picketing thus made an otherwise narrowly tailored and reasonable injunction barring residential picketing, unreasonable.

Here, unlike *Hibbs,* Appellants have a myriad of other ways to communicate their views to Dr. Klebanoff and have in fact done so regularly and vociferously. (T.C. Opinion at 15). Dr. Klebanoff practices medicine and performs abor-

tions at the Northeast Women's Center where Defendants and others in the anti-abortion movement regularly demonstrate. He is also employed by a local medical practice that has five offices in and around the Philadelphia area and demonstrators have picketed outside one of these offices in northeast Philadelphia. (N.T. at 59, June 16, 1987). Appellants also have other methods of communicating other than demonstrating. They can and have distributed leaflets to the neighbors, and they can contact neighbors via telephone, mail, local publications or other local media. Appellants in this case have many outlets for their expressive activity, while the privacy and home life which is rightfully due Dr. Klebanoff and his family can only be realized in one place, their home.

■ Therefore, because this injunction constitutes a content-neutral, narrowly tailored restriction on the place and manner where Appellants may exercise their right to communicate and disseminate their views on Dr. Klebanoff's abortion activities; and because there are a wide variety of alternative places and methods of communication, there is no constitutional impediment to this injunction which permanently enjoins the Appellants from picketing in front of the home of Dr. Klebanoff. We therefore affirm the trial court.

ORDER AFFIRMED.