**SMITHKLINE BEECHAM CORP., d/b/a GlaxoSmithKline, Esther Cheung, Minnie Iwamto and Rosemary Lecompte**

v.

**STOP HUNTINGDON ANIMAL CRUELTY USA, Hugs for Puppies, Inc., Nicholas Cooney, David Lambon, Christopher Semick, Amandah Povilitus and John Does 1–10.**

**Appeal of Nicholas Cooney.**

Superior Court of Pennsylvania.

Submitted June 16, 2008.
Filed Oct. 3, 2008.

---

Nicholas Cooney, appellant, pro se.

Walter M. Eiinhorn, Jr., Philadelphia, for appellee.

BEFORE: ORIE MELVIN, KLEIN and FITZGERALD *, JJ.

OPINION BY KLEIN, J.:

¶ 1 Nicholas Cooney appeals from the order finding him in contempt of a November 27, 2006 injunction ("the 2006 injunction") and the issuance of a more restrictive injunction, dated June 22, 2007 ("the 2007 injunction"). Cooney claims on appeal that the 2007 injunction is an unconstitutional restriction on his First Amendment free speech rights, that the lower court impermissibly assumed extraterritorial jurisdiction in issuing the 2007 injunction, and that the lower court erred in finding him to be in contempt of the 2006 injunction. We affirm in part and reverse in part.

¶ 2 GlaxoSmithKline (GSK) is a pharmaceutical company that contracts with private laboratories such as Huntingdon Life Sciences, LTD (HLS) to conduct research on its products. Cooney is the director of Hugs for Puppies (HFP), a Philadelphia-based non-profit animal advocacy organization, and a member of the Philadelphia branch of Stop Huntingdon Animal Cruelty (SHAC), an international animal advocacy group that partakes in various forms of protest against HLS because it believes HLS performs cruel and inhumane testing on animals. Cooney, HFP and members of SHAC began target protesting GSK and its employees in 2006 because of GSK's business relationship with HLS. Cooney, his codefendants and other members of HFP and SHAC picketed outside of GSK's Philadelphia facilities, as well as outside personal residences of several of GSK's top employees. The picketers often threatened the employees with statements such as "we know where you sleep at night" and "I'll kill you, you motherfucker!" The picketers used bullhorns, published defamatory materials, harassed GSK employees and their families and frequently blocked ingress and egress to both private homes and GSK's facilities. On several occasions the picketers sprayed graffiti on personal property, wore bandanas to cover their faces or wore all black, and made harassing phone calls to employees.

¶ 3 On November 8, 2006, GSK and several individual employees (Individual Plaintiffs) filed a complaint in equity seeking an injunction to stop harassment and intimidation by SHAC, HFP, Cooney and several other individuals. The lower court issued an injunction on November 27, 2006 enjoining them from, *inter alia,* harassing, stalking and intimidating GSK and the Individual Plaintiffs and preventing them from picketing or protesting within 100 feet of the Individual Plaintiffs' homes and within 50 feet of GSK's facilities. Cooney appealed the 2006 injunction, arguing that it violated his First Amendment rights, and this Court upheld its constitutionality. On June 20, 2007, GSK and the Individual Plaintiffs filed an emergency petition for civil contempt, alleging that Cooney and others violated the injunction by organizing and conspiring with another group of animal rights extremists (AREs) and violently protesting at the Individual Plaintiffs' homes and GSK's facilities. At the June 22, 2007 hearing on the emergency petition, at which Cooney and his codefendants did not appear, the lower court found Cooney and his codefendants in contempt of the 2006 injunction and amended the injunction to further restrict the actions of Cooney and the other defendants. Specifically, the amended injunction (the 2007 injunction) states in relevant part:

---

* Former Justice specially assigned to the Superior Court.

5) The above named defendants, individually and collectively, and all persons acting in any manner at their behest or in concert with them, directly or indirectly, are hereby ENJOINED from:
. . .

d) trespassing, entering, coming onto, or interfering with the use and enjoyment of any real property owned, occupied, or in the possession of GSK [or] the Individual Plaintiffs . . .; . . .

f) placing or maintaining upon any website or otherwise disseminating any private or personal information, including but not limited to, names, home addresses, home phone numbers, mobile phone numbers, e-mail addresses, bank account numbers, credit card numbers, social security numbers, vehicle license plate numbers, or drivers' license numbers, regarding GSK [or] the Individual Plaintiffs . . .; . . .

h) at any time or in any manner whatsoever engaging in any picketing, demonstrating, leafleting, protesting or congregating at GSK's facilities, including but not limited to offices, laboratories, manufacturing plants or parking lots, or otherwise preventing or obstructing any ingress or egress of people, vehicles, or any deliveries to or from GSK's facilities;

i) at any time or in any manner whatsoever engaging in any picketing, demonstrating, leafleting, protesting or congregating at the homes of the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee;

j) in any manner whatsoever engaging in any action or conduct which is intended to or has the necessary effect of threatening, intimidating, harassing or coercing the Individual Plaintiffs and/or any person otherwise affiliated with or providing goods or services to GSK and the Individual Plaintiffs, including any person known or believed to be a GSK employee

(Injunction Order, dated June 22, 2007.) This appeal follows.

¶ 4 First, Cooney argues that the 2007 injunction is an unconstitutional restriction on protected speech. Cooney claims his First Amendment rights are violated because the 2007 injunction is a blanket ban on picketing at both residential and business sites that leaves him and his codefendants with no alternate means of communication. Additionally, Cooney argues that provision 5(d)[1], which prohibits interference with the use and enjoyment of real property, is unconstitutionally vague. He also challenges provision 5(f), which prohibits publication of personal information of GSK's employees, as being unconstitutional because the First Amendment protects the publication of truthful material. Finally, Cooney claims that provision 5(j) is an unlawful expansion of the lower court's extraterritorial jurisdiction.

■■■ ¶ 5 When reviewing a content-neutral injunction,[2] this Court must ask

---

**1.** In his brief, Cooney challenges provisions 6(d), (f) and (j) of the 2007 injunction but instead quotes the language of provisions 5(d), (f) and (j). Because it appears to be a mistake on his part, we will refer to the proper provision numbers he wishes to challenge, which are provisions 5(d), (f) and (j).

**2.** Although Cooney has not claimed the injunction is content based, given the import of the First Amendment, we nonetheless make note that the injunction is content-neutral. This means the speech is not regulated due to a disagreement with the message conveyed. *See Commonwealth v. Scott,* 878 A.2d 874 (Pa.Super.2005). A restriction on speech that

"whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994). A commonly recognized government interest is "[t]he State's interest in protecting the wellbeing, tranquility, and privacy of the home," which is considered to be "of the highest order in a free and civilized society." *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). This Court has held that "courts of this Commonwealth can enjoin activity which violates an individual's residential privacy." *Klebanoff v. McMonagle*, 380 Pa.Super. 545, 552 A.2d 677, 678 (1988) (citations omitted). Additionally, as noted by this Court, "[a]s the mode of expression moves from the printed page or from pure speech to the commission of public acts the scope of permissible regulation of such expression increases." *Rouse Philadelphia Inc. v. Ad Hoc '78*, 274 Pa.Super. 54, 417 A.2d 1248, 1254 (1979). This Court has also stated, "[i]t is well-settled that, under the First Amendment, expressive activity may be subject to reasonable time, place and manner restrictions." *Klebanoff, supra.* However, such restrictions must "leave open ample alternative channels of communication." *Id.* Finally, it must be noted that the Supreme Court has held that "[t]he failure of the first order to accomplish its purpose may be taken into consideration in evaluating the constitutionality of the broader order." *Madsen, supra* at 770, 114 S.Ct. 2516. It is within this framework that we consider Cooney's challenges to the constitutionality of the 2007 injunction.

■■■ ¶ 6 First, we note that Cooney's challenges to provisions 5(d), (f) and (j) cannot be addressed on this appeal because they are precluded by the law of the case doctrine. The law of the case doctrine,

> refers to a family of rules which embody the concept that a court involved in the later phases of a litigated matter should not reopen questions decided by another judge of that same court.... Among the related but distinct rules which make up the law of the case doctrine are that: ... (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court.

*Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995). Cooney previously appealed the 2006 injunction, taking issue with provisions 5(d), (f) and (*l*). This Court upheld the constitutionality of these provisions. *See Smithkline Beecham, et al. v. Stop Huntingdon Animal Cruelty USA, et al.*, 945 A.2d 781 (Pa.Super.2007) (unpublished memo). With regard to the dissemination of personal information of GSK's employees, which is embodied in provision 5(f) of both the 2006 and 2007 injunctions, this Court stated, "Cooney is incorrect in concluding that publication of such personal information is protected speech, particularly when done so for the purpose of threats or incitement to lawlessness." *Id.* (unpublished memo at 28.) This Court also addressed Cooney's challenge to 5(*l*) of the 2006 injunction, which is identical to 5(j) of the 2007 injunction, by

---

is not content based is still considered neutral even if it might affect some speakers or messages and not others. *Id.* The 2007 injunction, on its face, does not seek to ban any subject matter from being protested. The purpose in enacting the restrictions is to prevent the excessive tactics used by the protesters, not to stifle the message itself. Finally, we note that a content-neutral time, place and manner regulation of protected speech need not be the least restrictive means of accomplishing the government's purpose. *Id.*

stating, "[w]hen, as here, a court acts *in personam*, it is not restricted by geographical boundary lines and it may enter any appropriate decree acting directly on the person even though the subject matter affected is outside its jurisdiction." *Id.* (unpublished memo at 30.) While we did not expressly address provision 5(d), which, in both the 2006 and 2007 injunctions, prohibits interference with the use and enjoyment of real property, we did affirm the 2006 injunction as a whole. Therefore, because provisions 5(d), (f) and (j) of the 2007 injunction were taken verbatim from the 2006 injunction, which was found by this Court to be constitutional, the law of the case doctrine precludes these issues from being decided again on second appeal.

■ ¶ 7 The 2007 injunction places further restrictions on Cooney and his codefendants by prohibiting all "picketing, demonstrating, leafleting, protesting or congregating at the homes of the Individual Plaintiffs." (Injunction Order, provision 5(i).) This provision is similar to one upheld in *Klebanoff, supra.* In *Klebanoff*, pro-life proponents picketed on numerous occasions outside the residence of Dr. Klebanoff. *Id.* The pickets were found to be disruptive and intrusive on Dr. Klebanoff's privacy so an injunction was issued that banned all picketing of his residence. *Id.* This Court upheld the ban stating, "[e]ven a complete ban on all expressive activity in a traditional public forum is permissible if substantial privacy interests are being invaded in an essentially intolerable manner." *Id.* at 680. This Court noted that the ban struck an appropriate balance between individual privacy interests and First Amendment rights because the pro-life advocates had "a myriad of other ways to communicate their views to Dr. Klebanoff," which included picketing at the doctor's offices, distributing leaflets, and call-

ing and sending mail to Dr. Klebanoff's neighbors. *Id.* at 681.

¶ 8 Similarly, in *Frisby, supra*, the town of Brookfield, Wisconsin adopted an ordinance that completely banned picketing "before or about" any residence in response to disruptive protesting by anti-abortion advocates outside the home of a local doctor. The United States Supreme Court stated:

> [T]he picketing is narrowly directed at the household, not the public. The type of picketers banned by the Brookfield ordinance generally do not seek to disseminate a message to the general public, but to intrude upon the targeted resident, and to do so in an especially offensive way. Moreover, even if some such picketers have a broader communicative purpose, their activity nonetheless inherently and offensively intrudes on residential privacy.

*Id.* at 486, 108 S.Ct. 2495. The Court upheld the ordinance stating it was sufficiently limited in nature so as to provide ample alternatives for the protesters to communicate their message by, for example, marching through the neighborhoods, going door-to-door, distributing literature, and contacting residents by telephone, so long as such methods did not rise to the level of harassment. *Id.*

¶ 9 Here, the record demonstrates the harassing, intrusive and threatening nature of the protests held by Cooney and his codefendants outside of the Individual Plaintiffs' houses. Several Individual Plaintiffs testified that they felt "bullied" and scared in their own homes. They testified to incidents of their homes being graffitied, their door locks being glued shut, and their neighbors being told "it's [the Individual Plaintiff's] fault we're here." Even after the 2006 injunction, which sought to minimize the impact of these incidents on the Individual Plaintiffs

by instituting reasonable time, place and manner restrictions on the pickets, protests took place at the residences of the Individual Plaintiffs in which the protesters wore masks, used bullhorns, shouted obscenities and threats, and even hit one GSK employee over the head with a placard. The time, place and manner of these post–2006 injunction protests were in violation of the restrictions set forth in the 2006 injunction. These facts, as well as many others presented by the record which we have not mentioned but which we note are equally as appalling, provide ample evidence that Cooney and his codefendants have intruded upon the privacy interests of the Individual Plaintiffs in an intolerable manner. *Klebanoff, supra.* Given that the time, place and manner restrictions in the 2006 injunction did not adequately protect the privacy interests of the Individual Plaintiffs, the lower court properly issued a more restrictive injunction to ban all "picketing, demonstrating, leafleting, protesting or congregating at the homes of the Individual Plaintiffs". *See* Injunction Order, provision 5(i). *Madsen, supra.*

¶ 10 It is important to note that provision 5(i) prevents targeted picketing. *Frisby, supra.* As such, it allows for Cooney and his codefendants to use alternate avenues of communication to convey their message. While Cooney and his codefendants are banned from "picketing, demonstrating, leafleting, protesting or congregating" at the Individual Plaintiffs' homes, they are not banned from doing so throughout the rest of the neighborhood. They may picket, demonstrate, leaflet and protest so long as such actions are not targeted at the Individual Plaintiffs' residences but are instead carried out on a neighborhood-wide scale. Therefore, we hold that provision 5(i) does not unconstitutionally impinge on Cooney's First Amendment rights.

¶ 11 The 2007 injunction places further restrictions on Cooney and his codefendants by prohibiting all "picketing, demonstrating, leafleting, protesting or congregating at GSK's facilities." (Injunction Order, provision 5(h).) This provision overly burdens the First Amendment rights of Cooney and his codefendants. The purpose of picketing outside GSK's facilities is, presumably, to direct their message to a group of people who have the ability to bring about the change they desire. Their message would arguably have less impact if Cooney and his codefendants could only convey their opinions to members of the public at-large. While we certainly do not condone the threatening and harassing nature of their pickets, provision 5(h), in preventing any and all protests from taking place at GSK's facilities, leaves Cooney and his codefendants with little, if any, alternate means to effectively and meaningfully communicate their message. By failing to allow for alternate means of communication, provision 5(h) violates Cooney's free speech rights. *Klebanoff, supra.*

¶ 12 We note that plaintiffs' brief details the cowardly, excessive, harassing and threatening behavior of the protestors. Nonetheless, it is the protests at personal homes, directed at specific persons that have gone beyond the pale. While protests at GSK facilities have been loud and intrusive, as documented in this record, such behavior can be controlled through less extreme means without a total ban on protesting at GSK business sites. The behavior of these defendants, including Cooney, shows that more restrictive time, place and manner restrictions may be appropriate at GSK sites. However, at this point in time and based upon this record, an outright ban is overbroad.

¶ 13 Additionally, this provision is unlike any in the cases cited above and,

indeed, unlike any we have found in other cases. In *Klebanoff, supra,* this Court noted that the defendant protesters, while banned from picketing outside Dr. Klebanoff's residence, were still able to protest at Dr. Klebanoff's places of business. In *Madsen, supra,* the Supreme Court upheld an injunction which included a 36–foot buffer zone around the entry to an abortion clinic, but noted that "[t]he need for a complete buffer zone near the clinic entrances and driveway may be debatable." In *Hibbs v. Neighborhood Organization to Rejuvenate Tenant Housing (N.O.R.T.H.),* 433 Pa. 578, 252 A.2d 622 (1969), the Pennsylvania Supreme Court invalidated an injunction that prohibited the protesters from picketing outside of Hibbs' home because Hibbs conducted his real estate business solely from his residence. These cases reiterate the idea that picketing, which is a form of expressive speech, may be subject to reasonable time, place, and manner restrictions. *Rouse, supra; Klebanoff, supra.* However, none of them support a total ban on picketing outside a public forum where individual privacy interests are not at stake. Therefore, we find provision 5(h) of the 2007 injunction to be an unconstitutional restraint on Cooney's First Amendment rights.

¶ 14 It is important to note that we have taken judicial notice of Cooney's violation of the 2006 injunction which contained reasonable time, place and manner restraints on picketing outside of GSK's facilities. We remand so that the lower court can amend provision 5(h) of the 2007 injunction by creating reasonable time, place and manner restrictions which, because of their inability to effectively deter Cooney's conduct, limit Cooney's conduct more than provisions 5(h) and (i) of the 2006 injunction. *Madsen, supra.*

■■■■ ¶ 15 Cooney's second argument is that the lower court erred in finding him to be in civil contempt of the 2006 injunction. Cooney claims that he was not properly served notice of his contempt hearing and, therefore, did not appear and did not present evidence on his own behalf.[3] He also argues that, regardless of whether or not he was properly served notice, he should not have been found to be in contempt. Cooney argues that because he did not attend or coordinate the protests, he did not violate the 2006 injunction. In the alternative, Cooney argues that he should be granted an opportunity to defend himself in further fact-finding proceedings on the issue.

¶ 16 Cooney's claim that he was not properly served notice is without merit. Pennsylvania Rule of Civil Procedure 440(a)(2)(i) states that, where an individual is not represented by an attorney, as in this case, "service shall be made by ... leaving a copy for the party at ... the residence or place of business of the party." In Cooney's own brief he states that on the day before the hearing the plaintiffs left the notice with an individual at Cooney's residence, from which he also runs HFP. As such, the lower court appropriately found that Cooney was properly served notice of the emergency civil contempt hearing.[4]

---

**3.** Cooney apparently makes the same argument on behalf of Defendants David Lambon and Hugs for Puppies. As far as we can tell, Cooney has no standing to argue for these defendants.

**4.** In reviewing an appeal of a finding of contempt, this Court's scope of review is narrow.

*Rhoades v. Pryce,* 874 A.2d 148 (Pa.Super.2005). "We will reverse only upon a showing of an abuse of discretion. This court must place great reliance on the sound discretion of the trial judge when reviewing an order of contempt." *Id.* at 153 (citations omitted).

¶ 17 With respect to the court's finding of contempt, the 2006 injunction included provisions which placed time, place and manner restrictions on Cooney and his codefendants, as well as "all persons acting in any manner at their behest or in concert with them, directly or indirectly". (Injunction Order, provision 5.) The relevant conduct prohibited included: making threats of violence; harassing and intimidating GSK employees; picketing, demonstrating, protesting or congregating within 50 feet of the entryways to GSK's facilities; preventing or obstructing ingress or egress to GSK's facilities; picketing, demonstrating, protesting or congregating at GSK's facilities within 100 feet of the premises in groups of more than 10 people for more than an hour outside the hours of 9 a.m. and 5 p.m., Monday through Friday, with amplification devices, wearing masks, bandanas, or hoods, without giving the police at least 72 hours notice; and picketing, demonstrating, protesting or congregating within 100 feet of the homes of GSK employees in groups of more than 5 people for more than an hour outside the hours of 10 a.m. and 12 p.m., Monday through Friday, with any amplification device, wearing masks, bandanas, or hoods, without giving the police at least 72 hours notice.

¶ 18 At the contempt hearing, evidence was presented by the plaintiffs that established the following facts. AREs were planning a "Shut Them Down 2007 East Coast Tour" in which they would protest HLS in several major cities on the east coast, including Philadelphia on June 10, 2007. HFP's website advertised an HLS protest that was to occur on June 10th and listed Cooney's residence as the meeting place. Video surveillance outside of Cooney's home showed several AREs leaving his house on the morning of June 10th with sleeping bags and pillows. Cooney admitted that the AREs had spent the night at his house. Those same AREs went to several of the Individual Plaintiffs' homes to protest. The AREs wore masks, used bullhorns, yelled threats, blocked ingress and egress, and shouted obscenities. On June 11th, more protests by some of the same AREs seen leaving Cooney's house the day before took place at several of the Individual Plaintiffs' homes and at GSK's facilities. These protests also involved AREs wearing masks, using bullhorns and shouting obscenities. Additionally, these activities took place outside the time and distance restrictions listed in the injunction. It is also important to note that the AREs only protested outside the homes of the Individual Plaintiffs involved in this action; no other GSK employees were targeted.

¶ 19 After hearing the evidence, the lower court noted, "Plaintiffs presented videotape, photographs, and testimony establishing that Respondents had violated the injunction." (Trial Court Opinion, February 5, 2008). These facts, especially when taken in the aggregate, lead to the reasonable inference that Cooney helped to organize and coordinate the AREs who protested on June 10th and 11th. Therefore, the lower court did not abuse its discretion in finding Cooney to be in contempt for the protests of the AREs who were "acting in [a] manner at [Cooney's] behest or in concert with [Cooney], directly or indirectly". (Injunction Order, 11/27/06, at provision 5.)

¶ 20 The order of the lower court is affirmed as to the finding of the constitutionality of the 2007 injunction, with the exception of provision 5(h), and as to the finding of civil contempt. The order of the lower court is reversed and remanded as to provision 5(h) of the 2007 injunction for proceedings consistent with this decision. Jurisdiction relinquished.