**[J-51-2023] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| FREDERICK E. OBERHOLZER, JR. AND DENISE L. OBERHOLZER, | : | No. 104 MAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Superior Court at No. 794 EDA 2020 |
| | : | dated April 18, 2022, Vacating the |
| | : | judgment of the Montgomery County |
| v. | : | Court of Common Pleas, Civil |
| | : | Division, entered April 1, 2020, at |
| | : | No. 2016-11267 and Remanding. |
| SIMON AND TOBY GALAPO, | : | (The order of the Superior Court |
| | : | dated April 5, 2022, withdrew the |
| Appellants | : | March 7, 2022, memorandum.) |
| | : | |
| | : | ARGUED:  October 17, 2023 |

## DISSENTING OPINION

**JUSTICE BROBSON**                              **DECIDED:  August 20, 2024**

I respectfully dissent.  As explained below, I would conclude that the trial courts of this Commonwealth have the authority to enjoin residential speech protected by Article I, Section 7 of the Pennsylvania Constitution[1] that rises to the level of a private nuisance and disrupts the quiet enjoyment of a neighbor's home.  I would further conclude that the injunction (Injunction) the Court of Common Pleas of Montgomery County (trial court) entered in this matter is content neutral, furthers the Commonwealth's significant interest in protecting the privacy and quiet enjoyment of Frederick and Denise Oberholzer's (the Oberholzers) home, and burdens no more of the speech of Dr. Simon and Toby Galapo

---

[1] Article I, Section 7 of the Pennsylvania Constitution provides, in pertinent part:  "The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

(the Galapos) than necessary to protect the Oberholzers' right to residential privacy. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). As such, I would reverse the Superior Court's judgment vacating the trial court's order and reinstate the Injunction.

## I. Permanent Injunctive Relief

"To justify the award of a permanent injunction, the party seeking relief 'must establish [(1)] that [the] right to relief is clear, [(2)] that an injunction is necessary to avoid an injury that cannot be compensated by damages, and [(3)] that greater injury will result from refusing rather than granting the relief requested.'" *Kuznik v. Westmoreland Cnty. Bd. of Commr's*, 902 A.2d 476, 489 (Pa. 2006) (quoting *Harding v. Stickman*, 823 A.2d 1110, 1111 (Pa. Cmwlth. 2003)). In affirming the Superior Court's vacatur of the Injunction, the Majority essentially disposes of this entire matter on the first permanent injunction prong above: the Oberholzers' right to relief is not clear. The Majority reaches that conclusion by finding that (1) the Galapos' signs are "pure speech" that do not constitute picketing, and (2) residential signs, as a matter of law, cannot disrupt the quiet enjoyment of the home, nor did the Oberholzers make such a showing in this case. In reaching that conclusion, the Majority recognizes that trial courts can enjoin residential speech protected by Article I, Section 7 of the Pennsylvania Constitution "upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." (Majority Op. at 48-49 (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)).) Nonetheless, the Majority finds that the Oberholzers failed to meet that standard. For multiple reasons, I cannot agree. Ultimately, I would hold that where an individual's residential speech rises to the level of a private nuisance that disrupts the quiet enjoyment of a neighbor's home, a trial court has the authority to enjoin that speech within the limits provided in *Madsen*.

A. Analysis

I begin by setting forth the general principles of law that guide the ensuing analysis. In *William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59 (Pa.), *cert. denied*, 368 U.S. 897 (1961), this Court held that Article I, Section 7 of the Pennsylvania Constitution "was designed to . . . prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege." *Goldman Theatres*, 173 A.2d at 62. As the Majority recognizes, however, "even where prior restraints potentially are in play, the nature of the communication [at issue] can alter the analysis." (Majority Op. at 40 (quoting *Ins. Adjustment Bureau v. Ins. Comm'r for the Com. of Pa.*, 542 A.2d 1317, 1324 (Pa. 1988).) This is because "[f]reedom of speech is not absolute or unlimited." *Wortex Mills v. Textile Workers Union of Am., C.I.O.*, 85 A.2d 851, 854 (Pa. 1952). Indeed, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985). Pertinent to this case, where speech disrupts the quiet enjoyment of the home, the government generally has the power to enjoin it. *See Klebanoff v. McMonagle*, 552 A.2d 677, 679 (Pa. Super. 1988) ("The public's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order." (citing *Carey v. Brown*, 447 U.S. 455, 471 (1980))), *appeal denied*, 563 A.2d 888 (Pa. 1989); *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) ("[W]e have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.").

Finally, an appellate court's standard of review of a permanent injunction entered by a trial court sitting in equity is as follows:

> The grant or denial of a permanent injunction is a question of law. *Buffalo Township v. Jones*, . . . 813 A.2d 659, 664 & n.4 ([Pa.] 2002). Regarding the trial court's legal determination, our standard of review is de novo, and our scope of review is plenary. *Id*. . . . . As in all equity matters,

however, we must accept the trial court's factual findings and give them the weight of a jury verdict where they are supported by competent evidence.

*Liberty Place Retail Assocs., L.P. v. Israelite Sch. of Universal Prac. Knowledge*, 102 A.3d 501, 506 (Pa. Super. 2014) (citation omitted); *Oberholzer v. Galapo*, 274 A.3d 738, 747 (Pa. Super. 2022) (same); *Buffalo Twp.*, 813 A.2d at 665 n.7 ("In reviewing fact-laden decisions, an appellate court displays a high level of deference to the trial court as the fact finder."). The Galapos have not challenged the trial court's findings of fact on appeal, instead raising only questions of law.

### 1. Nature of the Galapos' Speech

The Majority first concludes that the Galapos' signs constitute "pure speech" because the signs are not akin to picketing. (Majority Op. at 40.) In *Frisby*, the United States Supreme Court considered a facial challenge under the First Amendment to a Brookfield, Wisconsin ordinance that banned picketing "before or about" any residence. *Frisby*, 487 U.S. at 476. Construing the statute narrowly, the Supreme Court reasoned that the ordinance prohibited picketing only when directed at, or conducted in front of, individual residences—*i.e.*, when the picketing targeted a single home. Marching through the streets or routinely on several blocks, on the other hand, was permissible under the ordinance. So construed, the Supreme Court reasoned that the ordinance was narrowly tailored to eliminate the "exact source of the 'evil' it [sought] to remedy"—*i.e.*, the disruption of the quiet enjoyment of the home. *Id.* at 485. The Supreme Court explained:

> "The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Carey* . . . , 447 U.S.[] at 471 . . . . Our prior decisions have often remarked on the unique nature of the home, "the last citadel of the tired, the weary, and the sick," *Gregory v. Chicago*, 394 U.S. 111, 125 . . . (1969) (Black, J., concurring), and have recognized that "[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." *Carey*, . . . 447 U.S.[] at 471 . . . .

> One important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply

to avoid speech they do not want to hear, *cf. Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11 (1975) . . . ; *Cohen v. California*, 403 U.S. 15, 21[-]22 . . . (1971), the home is different. "That we are often 'captives' outside the sanctuary of the home and subject to objectionable speech . . . does not mean we must be captives everywhere." *Rowan v. Post Office Dept.*, 397 U.S. 728, 738 . . . (1970). Instead, a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom. *See, e.g., FCC v. Pacifica Found*[.], 438 U.S. 726, 748[-]49 . . . (1978) (offensive radio broadcasts); *id.*[] at 759[-]60 . . . (Powell, J., concurring in part and concurring in judgment) (same); *Rowan*, *supra* (offensive mailings); *Kovacs v. Cooper*, 336 U.S. 77, 86[-]87 . . . (1949) (sound trucks).

This principle is reflected even in prior decisions in which we have invalidated complete bans on expressive activity, including bans operating in residential areas. *See, e.g.*, *Schneider v. State*, 308 U.S. 147, 162[-]63 . . . (1939) (handbilling); *Martin v. Struthers*, 319 U.S. 141 . . . (1943) (door-to-door solicitation). In all such cases, we have been careful to acknowledge that unwilling listeners may be protected when within their own homes. In *Schneider*, for example, in striking down a complete ban on handbilling, we spoke of a right to distribute literature only "to one willing to receive it." Similarly, when we invalidated a ban on door-to-door solicitation in *Martin*, we did so on the basis that the "home owner could protect himself from such intrusion by an appropriate sign 'that he is unwilling to be disturbed.'" *Kovacs*, 336 U.S.[] at 86 . . . . We have "never intimated that the visitor could insert a foot in the door and insist on a hearing." *Ibid*. There simply is no right to force speech into the home of an unwilling listener.

*Id.* at 484-85, 487 ("The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech."). Accordingly, the Supreme Court upheld the ordinance.

In *Klebanoff*, pro-life demonstrators regularly picketed for almost a year outside the home of Dr. Klebanoff, who performed abortions in his medical practice. A trial court ultimately entered a permanent injunction banning the picketing entirely, finding that the picketing caused immediate and irreparable harm to the Klebanoffs, "greater injury would occur by refusing the injunction than granting it, and that the Klebanoffs had no adequate remedy at law." *Klebanoff*, 552 A.2d at 677. On appeal, the picketers challenged the injunction under Article I, Section 7 of the Pennsylvania Constitution. Referencing *Frisby*,

the Superior Court held, as a matter of first impression, that "courts of this Commonwealth can enjoin activity which violates an individual's residential privacy." *Id*. at 678. The Superior Court then reasoned that the injunction was content neutral because it banned all picketing without reference to the content or subject matter of the protest and it contained no subjective or discriminatory enforcement.

Like the United States Supreme Court in *Frisby*, moreover, the Superior Court concluded that the injunction served to protect the substantial state interest, similarly recognized in Pennsylvania law, of residential privacy. *Id*. at 679 (citing *Hull v. Curtis Pub. Co.*, 125 A.2d 644, 645-66 (Pa. Super. 1956) (recognizing right to residential privacy)). The Superior Court explained:

> The public's interest in protecting the well-being, tranquility, and privacy of the home is of the highest order, *Carey* . . . , 447 U.S. . . . [at] 471 . . . . The home has been called "the last citadel of the tired, the weary, and the sick," *Gregory* . . . , 394 U.S. . . . [at] 125 . . . . The home serves to provide, among other things, a [refuge] from today's complex society where we are inescapably captive audiences for many purposes. *Rowan* . . . , 397 U.S. . . . [at] 738 . . . . Normally, outside of the home, consonant with the [Pennsylvania and United States] Constitution[s], we expect individuals to avoid unwanted speech, "simply by averting [their] eyes." *Cohen* . . . , 403 U.S. . . . [at] 21 . . . . But such avoidance within the walls of one's own house is not required. Therefore, the courts have repeatedly held that individuals are not required to welcome unwanted speech and the State may act to avoid such intrusions into the privacy of the dwelling place, *Frisby*[.]

*Id.* The Superior Court also found that the injunction was narrowly tailored to serve that purpose, noting that "[t]he permissible scope of the restriction . . . depends on where, in the spectrum from conduct to pure speech, the speech in question lies." *Id*. at 680. Indeed, the Superior Court noted that "[e]ven a complete ban on all expressive activity in a traditional public forum is permissible if substantial privacy interests are being invaded in an essentially intolerable manner." *Id.* (citing *Erznoznik*, 422 U.S. at 210).

In that regard, the Superior Court referenced its own decision in *Rouse Philadelphia Inc. v. Ad Hoc '78*, 417 A.2d 1248 (Pa. Super. 1979), *cert. denied*, 449 U.S. 1004 (1980), wherein it explained:

> [A]s a person's activities move away from *pure speech* and into the area of expressive *conduct* they require less constitutional protection. As the mode of expression moves from the *printed* page or from *pure speech* to the commission of public *acts* the scope of permissible regulation of such expression increases.

*Id.* (emphasis in original) (quoting *Rouse*, 417 A.2d at 1254). As to the injunction, the Superior Court reasoned:

> Much broader restrictions on expressive activities have been validated in the past for far less intrusive activities on far less substantial rights than the right to enjoy privacy in one's own home. For instance, in *Members of City Council v. Taxpayers For Vincent*, 466 U.S. 789 . . . (1984), the [United States Supreme] Court upheld a municipal ordinance prohibiting the posting of signs on public property in the interest of eliminating visual blight. Again, in *Lehman v. City of Shaker Heights*, 418 U.S. 298 . . . (1974), the [Supreme] Court held a city's prohibition of political advertising on buses constitutional because such advertising interfered with the city's interest in rapid, convenient and pleasant transit, (although commercial advertising was permitted). In this case, given the Commonwealth's substantial interest in protecting the use and enjoyment of one's own home, the injunction does no more than target the exact source of the evil it seeks to remedy. *Frisby*[.]

*Id*. at 681. Referencing the overwhelming evidence in the factual record establishing that the picketers invaded the privacy and quiet enjoyment of the Klebanoffs' home, the Superior Court concluded that a complete ban on such activity was warranted. *See id*. at 679-80. Finally, because the injunction allowed ample alternatives for the picketers to express their pro-life views to Dr. Klebanoff, including at five different offices where Dr. Klebanoff practiced or by contacting "neighbors via telephone, mail, local publications or other local media," the Superior Court upheld the injunction. *Id*. at 682.

The trial court and Superior Court found the speech at issue in this case analogous to the picketing in *Frisby* and *Klebanoff* with regard to the targeted nature of the Galapos' signs. I agree with their reasoning. A review of the hearing transcript on the Oberholzers'

request for a preliminary injunction based on false light privacy, which was the only hearing at which Dr. Galapo and Mr. Oberholzer testified, demonstrates that the Galapos' intent in posting the signs was to harass the Oberholzers and coerce them to alter their behavior.

Specifically, the Oberholzers' counsel questioned Dr. Galapo as to his purpose for erecting the signs:

[Oberholzers' counsel]: Is that what you want somebody to believe when they see that sign, that Mr. Oberholzer and his wife were killing Jews?

[Dr. Galapo]: No. What I want [the Oberholzers] to know is that you cannot -- what I want to accomplish by the signs is to protest behavior which we perceive as being racist towards myself, my wife, and my family.

(Reproduced Record (R.R.) at 244a, 293a, 295a ("The purpose of the signs again is my protesting this behavior;" "[t]he purpose is to protest the behavior of what the Oberholzers have been doing in a racist fashion to me and my family.").) Dr. Galapo then explicitly *rejected* the notion that he erected the signs for anyone other than the Oberholzers:

[Oberholzers' counsel]: You want everybody who goes by on that street either in a car, on the sidewalk, living in the neighborhood, anybody living next to the Oberholzers, you want them to see the sign that is directed to the Oberholzers; correct? You want them to see that sign?

[Dr. Galapo]: No.

[Oberholzers' counsel]: It's there to see?

[Dr. Galapo]: No.

[Oberholzers' counsel]: You said you can see it?

[Dr. Galapo]: You can see it, but that's not what I want.

[Oberholzers' counsel]: You want the world to know that –

[Trial court]: Let the witness complete his answer.

[Oberholzers' counsel]: Sure.

[Dr. Galapo]: *What I want is the Oberholzers to stop their behavior of racism as we perceive it, and then the signs will come down.* And further proof of this, Your Honor, is that we've taken them down on our own volition three times. Three times.

We agreed in this consent order again to take it down in hope that they would cut out their behavior, that both Mr. Oberholzer and his wife

would stop their shenanigans and their games of harassing my children, all within this context of calling my kids fucking Jews -- and I apologize for using those words -- of calling me a fucking Jew, of speaking about us as Jews and therefore some deficiency in us.

And over time, even when I felt that the threat was diminished, I took down signs. But every time I'd take them down, unfortunately, they would increase their behavior and try to push the card and push the line, and that's where we stand, and that's why the signs were up.

(*Id.* at 249a-251a (emphasis added).)

Dr. Galapo stated that the signs are directed to the Oberholzers and that he was unaware of the extent to which the neighbors could see the signs from their homes. (*Id*. at 270a-271a.) In fact, Dr. Galapo testified that it was *irrelevant* whether the neighbors saw the signs because that was not the intent of the signs; rather, Dr. Galapo explained that "[t]he intent of the signs were for the Oberholzers to change a behavior which we perceived as being racist towards my kids, my wife, and me." (*Id*. at 257a, 261a-262a, 270a ("[Oberholzers' counsel]: The signs are directed to the Oberholzers, and the content, the content on the signs, those words, that's also direct[ed] to the Oberholzers? [Dr. Galapo]: Correct.").) Finally, and most critically, Dr. Galapo indicated that the message on the signs was irrelevant to his primary goal of stopping the Oberholzers' racist behavior: "The issue is getting somebody to stop behavior that we perceive as racist. *These signs--it could be any sign. It doesn't matter*." (*Id*. at 306a (emphasis added).)

To be clear, I in no way endorse the Oberholzers' anti-semitic behavior toward the Galapos. In fact, I find their behavior repugnant. But I cannot ignore that this case concerns the legality of the *Galapos*' speech, not the Oberholzers'. And the foregoing testimony clearly demonstrates that Dr. Galapo erected the signs to protest the perceived anti-semitic behavior of the Oberholzers against the Galapos and to coerce them to alter their behavior. Once the signs accomplished that goal, Dr. Galapo testified that he would take the signs down. The message on the signs was irrelevant to the ultimate goal of

coercion. Further, while I recognize that the Galapos' signs potentially relate to a "public concern," *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011), the signs were not directed toward the public. Instead, the Galapos erected the signs in their *back yard* and directed them strictly toward the Oberholzers—*i.e.*, one private home—while placing zero signs in their front yard for the public to see. Additionally, if the Galapos intended to reach a broader audience with the signs, there would be no need for the Galapos to appeal from the trial court's order entering the Injunction because, under the Injunction's limitations, the signs were still visible to the neighbors, just not the Oberholzers. The nail in the coffin that cements these points is Dr. Galapo's testimony *that it was irrelevant whether anyone other than the Oberholzers saw the signs*. Thus, the foregoing makes clear that the Galapos' signs were *targeted* speech designed to disrupt the quiet enjoyment of the Oberholzers' home.

The Majority disagrees, however, and concludes that the Galapos' signs "constituted an act of pure speech" because the signs "do[] not fit the bill of 'picketing.'" (Majority Op. at 40.) The Majority reaches that conclusion because the signs lack the non-speech elements associated with picketing, such as assembly, that form "the basis and justification for state interference." (*Id*. (quoting *1621, Inc. v. Wilson*, 166 A.2d 271, 275 (Pa. 1960)).) The Majority paints the analysis as black and white; either (1) the speech is picketing, which is targeted speech the state can enjoin, or (2) it is "pure speech" that is impregnable. The interest that animated the decisions in *Frisby* and *Klebanoff*, however, was the protection of residential privacy. Neither case stands for the proposition that picketing is the only manner of speech that can disrupt the quiet enjoyment of the home. And to narrow those cases into such a dichotomy—*i.e.*, either picketing or "pure speech"—overlooks that the issue here is one of first impression that does not fall cleanly into this Court's or the United States Supreme Court's precedent.

Nonetheless, *Frisby* and *Klebanoff* make clear that the analysis revolves around whether the speech at issue disrupts the quiet enjoyment of the home, *not* whether the speech constitutes picketing.

In sum, I would conclude that the speech at issue is targeted speech that is intended to harass the Oberholzers and coerce them to alter their behavior, which makes the speech at issue similar in nature to the picketing activity in cases such as *Frisby* and *Klebanoff*. As explained below, this conclusion lends support to my belief that trial courts in the Commonwealth—and the trial court in this matter—have the authority to enjoin such speech where it can be shown that the speech disrupts the quiet enjoyment of the home.

2. Trial Court Authority to Enjoin Nuisance

The Majority recognizes that the Oberholzers' claim for permanent injunctive relief arises in private nuisance and that the trial court, sitting as a court of equity, entered the Injunction on that basis and not defamation or false light privacy. (*Id*. at 14 n.6 ("Moving forward, then, we operate under the understanding that injunctive relief was granted only on the nuisance cause of action.").) The Restatement (Second) of Torts defines private nuisance generally as "a nontrespassory invasion of another's interest in the private use and enjoyment of land." Rest. 2d Torts § 821D. Section 822 of the Restatement (Second) of Torts sets forth the general rule for demonstrating a private nuisance:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is . . .
>
> (a) intentional and unreasonable . . . .

Rest. 2d Torts § 822. "It is hornbook law that a [c]ourt of [e]quity possesses jurisdiction to . . . enjoin a nuisance." *Gardner v. Allegheny Cnty.*, 114 A.2d 491, 498 (Pa. 1955).

In *Youst v. Keck's Food Services, Inc.*, 94 A.3d 1057 (Pa. Super. 2014), for example, a neighbor erected drainage pipes on their property that changed the direction of a creek to flow directly onto Denny Youst's land. Youst operated a farm on his property

and testified that the redirection of the creek significantly harmed his ability to pasture and water his animals and that some of his animals died as a result. *Youst*, 94 A.3d at 1062-63. The trial court concluded that the neighbor's conduct constituted a private nuisance necessitating permanent injunctive relief, and the Superior Court affirmed. Referencing Section 821D of the Restatement (Second) of Torts, the Superior Court reasoned that the evidence clearly established that the neighbor's diversion of the creek onto Youst's land interfered with the quiet enjoyment of his property. *Id*. at 1071-74, 1079. Accordingly, the Superior Court concluded that the neighbor must "[u]ndoubtedly . . . abate th[e] nuisance . . . since the nuisance is continuing [and] the trial court possessed the authority to issue a permanent injunction." *Id*. at 1079. *See also Rhodes v. Dunbar*, 57 Pa. 274, 286 (Pa. 1868) (discussing permanent injunction in relation to proposed "planing-mill" near residential property that would create noise, sawdust, smoke, and soot allegedly constituting private nuisance).

The Majority rightly points out that the foregoing nuisance law does not involve Article I, Section 7 of the Pennsylvania Constitution. (*See* Majority Op. at 47 n.21.) The Majority, therefore, references other decisions to reach its ultimate conclusion that the trial court lacked the authority to enjoin the Galapos' speech in this case. For example, in *Willing v. Mazzocone*, 393 A.2d 1155 (Pa. 1978), the law firm of Quinn & Mazzocone represented Helen Willing in a workers' compensation matter. Believing that Quinn & Mazzocone defrauded her of funds that she was owed, Willing demonstrated in a public plaza directly outside Quinn & Mazzocone's offices. Specifically, Willing marched back and forth for several hours a day in the plaza wearing a "sandwich-board" around her neck stating: "**LAW FIRM of QUINN MAZZOCONE Stole money from me and Sold-me-out-to-the INSURANCE COMPANY**." *Willing*, 393 A.2d at 1156 (emphasis in

original).  Willing also pushed a shopping cart draped with an American flag and continuously rang a cowbell and blew a whistle to attract attention.

Attorneys Carl Mazzocone and Charles Quinn filed suit in equity court seeking to enjoin Willing from further demonstration.  After several hearings, it was adduced that Quinn & Mazzocone did not defraud Willing of any funds, but Willing refused to accept that factual finding.  *See id.* at 1157.  Accordingly, the trial court enjoined Willing from "further unlawful demonstration, picketing, carrying placards which contain defamatory and libelous statements and or uttering, publishing and declaring defamatory statements against [Quinn & Mazzocone]."  *Id*.  The Superior Court affirmed, but it modified the trial court's injunction to read:  "Helen R. Willing, be and is permanently enjoined from further demonstrating against and/or picketing Mazzocone and Quinn, Attorneys-at-Law, by uttering or publishing statements to the effect that Mazzocone and Quinn, Attorneys-at-Law stole money from her and sold her out to the insurance company."  *Id*.

This Court reversed, recognizing in the first part that Article I, Section 7 of the Pennsylvania Constitution is designed to "prohibit the imposition of prior restraints upon the communication of thoughts and opinions, *leaving the utterer liable only for an abuse of the privilege*."  *Id.* (emphasis added) (quoting *Goldman*, 173 A.2d at 62).  Rather, this Court adhered to the principle that equity lacks the power to enjoin publication of defamatory matter.  *Id*. at 1158.  In support of that rationale, this Court emphasized that Quinn & Mazzocone had an adequate remedy at law in the form of money damages that could make them whole for the defamation Willing perpetrated.  *Id*.

Based seemingly in part on the rationale of cases such as *Willing*, the Majority fashions a new legal standard for a trial court to enjoin residential speech protected by Article I, Section 7 of the Pennsylvania Constitution.  Specifically, the Majority explains that "although trial courts generally lack the power to enjoin speech under Article I,

Section 7, because '[f]reedom of speech is not absolute or unlimited,' *Wortex Mills*, 85 A.2d at 854, *we also hold that courts may enjoin speech upon a showing that 'substantial privacy interests are being invaded in an essentially intolerable manner.'" Cohen*, 403 U.S. at 21." (Majority Op. at 49-50 (emphasis added).) The Majority draws that standard from *Cohen v. California*, 402 U.S. 15 (1971), a United States Supreme Court decision concerning the First Amendment to the United States Constitution.

In *Cohen*, the appellant was observed wearing a jacket bearing the words "Fuck the Draft" in a county courthouse where women and children were present. The appellant was arrested and subsequently convicted of violating a since-amended California criminal statute that, at the time, prohibited "'maliciously and willfully disturb(ing) the peace or quiet of any neighborhood or person . . . by . . . offensive conduct."[2] *Cohen*, 403 U.S. at 16 (quoting Cal. Penal § 415). The United States Supreme Court struck down the statute and reversed the appellant's conviction, reasoning that the appellant's jacket was not obscene because it lacked erotic features and the wording on it did not constitute fighting words. Further, the Supreme Court commented on other "offensive" speech:

> Finally, in arguments before this Court much has been made of the claim that Cohen's distasteful mode of expression was thrust upon unwilling or unsuspecting viewers, and that the State might therefore legitimately act as it did in order to protect the sensitive from otherwise unavoidable exposure to appellant's crude form of protest. Of course, the mere presumed presence of unwitting listeners or viewers does not serve automatically to justify curtailing all speech capable of giving offense. *See, e.g., Organization for a Better Austin v. Keefe*, 402 U.S. 415 . . . (1971). While this Court has recognized that government may properly act in many situations to prohibit intrusion into the privacy of the home of unwelcome views and ideas which cannot be totally banned from the public dialogue, *e.g., Rowan v. United States Post Office Dept.*, 397 U.S. 728 . . . (1970), we have at the same time consistently stressed that 'we are often 'captives' outside the sanctuary of the home and subject to objectionable speech.' *Id.*, at 738 . . . . The ability of government, consonant with the Constitution, to

---

[2] Notably, although the appellant was arrested in a county courthouse, the California criminal statute was widely applicable to any location.

> shut off discourse solely to protect others from hearing it is, in other words, dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner. Any broader view of this authority would effectively empower a majority to silence dissidents simply as a matter of personal predilections.

*Cohen*, 403 U.S. at 21. Absent a more compelling state interest, the Supreme Court concluded that California could not, consistent with the First and Fourteenth Amendments, "make the simple public display here involved of this single four-letter expletive a criminal offense." *Id*. at 26.

I agree with the holdings in *Willing* and *Cohen*. Critically, however, *neither case concerned the quiet enjoyment of the home*. Immediately, that distinction sets this case apart. Further, both *Willing* and *Cohen* lacked any countervailing right that required balancing against the right to free speech under Article I, Section 7 of the Pennsylvania Constitution and the First Amendment to the United States Constitution. There is no constitutional right not to be defamed or, as *Cohen* makes clear, to not be offended in a public setting.[3] This renders *Willing* and *Cohen* of little-to-no precedential value to the present matter where a balancing of rights is necessary, and it provides no support for the new legal standard the Majority has adopted. And, as explained in more detail in Section II of this Opinion, a balancing of rights is precisely what the trial court in this matter did—*i.e.*, the trial court properly tailored the Injunction to provide adequate protection both to the Oberholzers' right to the quiet enjoyment of the home and to the Galapos' right to free speech under Article I, Section 7. Accordingly, because private nuisance is distinct from other torts in that it inherently involves the quiet enjoyment of the home, I believe that trial courts have the authority to enjoin residential speech protected by Article I,

---

[3] The Majority suggests the right to reputation in Article I, Section 1 of the Pennsylvania Constitution was at play in *Willing* (*see* Majority Op. at 45 n.20), but the right to reputation does not inhere in private defamation cases. Again, there is no constitutional right not to be defamed.

Section 7 that rises to the level of a private nuisance and disrupts the quiet enjoyment of the home within the limits imposed by *Madsen*.[4]

### 3. Quiet Enjoyment of the Home

Lastly, critical to the foregoing analysis is whether the Galapos' signs did, in fact, disrupt the quiet enjoyment of the Oberholzers' home. At the preliminary injunction hearing, Mr. Oberholzer testified that when he looked out his back window he saw "[n]othing but signs," that the signs made him feel "[h]orrible," and that, as a result, he saw a doctor who prescribed him anti-anxiety medication, which he used throughout the day and to sleep at night. (R.R. at 352a-353a.) Mr. Oberholzer also generally explained that neighbors negatively changed their attitudes toward him and his wife. (*See id.* at 356a-358a.) Mrs. Oberholzer testified via deposition that their neighbors were "acting differently" toward them as a result of the signs, a parent approached her at the daycare facility at which Mrs. Oberholzer works regarding the signs, and that the Oberholzers stopped hosting people at their home because they did not want to have to explain the signs. (*Id.* at 143a-147a.) Mrs. Oberholzer also explained that her doctor increased her anti-anxiety medication to three times a day. (*Id.* at 149a.)

---

[4] Contrary to the Majority's suggestion, moreover, this case does not concern enjoining residential speech based on one person's subjective dislike of that speech. (*See* Majority Op. at 52 n.23.) Rather, this case is based upon a private nuisance—*i.e.*, speech that disrupts a neighbor's quiet enjoyment of his home. Further, while the Majority criticizes my standard as being too low, its own legal standard, as set forth above, is just as likely to allow a neighbor to "haul[] [another landowner] into court" after taking offense to the landowner's residential speech. (*Id.*) Our organic charter guarantees access to the courts, but it does not guarantee success, Pa. Const. art. 1, § 11, and I think that the citizens of Pennsylvania would "be quite surprised to learn" that they are barred from seeking a remedy to a private nuisance in court simply because speech is at issue. (*See id.*) As a safeguard, the trial courts of this Commonwealth are well equipped to determine whether a person's residential speech disrupts a neighbor's use of his property just as trial courts do in other nuisance cases and to sanction frivolous lawsuits where necessary.

Based on the Oberholzers' testimony, "as well as the pointed preliminary injunction hearing testimony of [Dr.] Galapo," the trial court found that the Galapos' actions "severely and negatively impact[ed] the [Oberholzers'] well-being, tranquility, and quiet enjoyment of their home." (Trial Ct. Op. at 7.) The Majority, however, concludes that the trial court's determination in that regard "is not equivalent to a finding 'that substantial privacy interests are being invaded in an essentially intolerable manner[.]'" (Majority Op. at 53 (quoting *Cohen*, 403 U.S. at 21).) In other words, because the trial court did not apply the Majority's articulation of its *new* legal standard, the trial court erred as a matter of law and the Oberholzers are not entitled to relief. First, as explained above, the Majority provides no basis for why its new legal standard should apply rather than determining, like the trial court did in this matter, that the Galapos' speech constitutes a private nuisance that disrupts the quiet enjoyment of the Oberholzers' home. Further, if the Majority's standard is, indeed, a heightened one and the trial court was unaware of this new law, the Majority should remand this matter. On remand, the trial court can reassess whether the Oberholzers established that the Galapos intolerably invaded the Oberholzers' substantial privacy interest.

Nonetheless, even accepting the Majority's standard, I fail to see how a severe and negative impact upon the well-being, tranquility, and quiet enjoyment of the Oberholzers' home is insufficient to warrant injunctive relief. Surely, the quiet enjoyment of the home is a "substantial privacy interest." *See, inter alia, Frisby, supra*. The Majority also offers no explanation for how a severe and negative impact on that interest has any meaningful distinction from an "intolerable invasion" of privacy. Simply because the trial court did not intone the magic words the Majority would require does not mean that it reached an erroneous result.

Not only does the Majority apply a misguided and untested legal theory to this matter, but it also disregards the trial court's factual findings *that have support in the record*—all seemingly to reach its desired result of denying the Oberholzers relief. To reiterate, an appellate court's standard of review of a permanent injunction entered by a trial court sitting in equity is as follows:

> The grant or denial of a permanent injunction is a question of law. Regarding the trial court's legal determination, our standard of review is *de novo*, and our scope of review is plenary. *As in all equity matters, however, we must accept the trial court's factual findings and give them the weight of a jury verdict where they are supported by competent evidence*.

*Liberty Place*, 102 A.3d at 506 (emphasis added) (citations omitted); *Oberholzer*, 274 A.3d at 747 (same); *Buffalo Twp.*, 813 A.2d at 665 n.7 ("In reviewing fact-laden decisions, an appellate court displays a high level of deference to the trial court as the fact finder."). The Majority fails to adhere to this standard. Instead, despite insisting that it takes the trial court's factual findings and credibility determinations "at face value," (Majority Op. at 55 n.2.), it substitutes its contrary assessment of the harm to the Oberholzers with that of the trial court, explaining:

> Here, though, *we are unconvinced that the Galapos' signs intolerably intrude upon any substantial privacy interests held by the Oberholzers*. The Galapos' signs are stationed exclusively on their own property and they lack any coercive or other element that might implicate the Oberholzers' privacy interests. *See* Deposition of Denise Oberholzer, 3/13/18, at 42-43 (admitting none of the signs mentioned the Oberholzers by name, encroached their property, or were threatening); Deposition of Frederick Oberholzer, 3/13/18, at 29-30 (same). Nor do the signs present any type of actionable, non-speech-based nuisance, like excessive illumination or loud noises. *See Kohr v. Weber*, 166 A.2d 871, 874 (Pa. 1960) ("loud noises, glaring illumination, and swirling dust clouds which" accompanied facility for drag-racing properly enjoined). The signs are just that: signs. All homeowners at one point or another are forced to gaze upon signs they may not like on their neighbors' property — be it ones that champion a political candidate, advocate for a cause, or simply express support or disagreement with some issue.

(Majority Op. at 49 (emphasis added).)  Indeed, the Majority baldly concludes that "the record does not support . . . a conclusion" that the Galapos' signs intolerably invade the Oberholzers' substantial privacy interest without any discussion of the testimony or facts the trial court found significant to its conclusion.  (*Id*. at 53.)  Because the Majority's doing so displaces the trial court's factual findings, I cannot agree.

## B.  Conclusion

To summarize, I view the Galapos' signs as targeted speech intended to harass the Oberholzers and coerce them to alter their behavior.  As a result, I believe the Galapos' speech rises to the level of a private nuisance, which the trial court had the authority to enjoin.  Finally, the trial court's factual determination that the Galapos' signs disrupted the quiet enjoyment of the Oberholzers' home is supported by the record, and, therefore, this Court should not disturb it.  And because this case concerns the quiet enjoyment of the home and not some other "substantial privacy interest," I believe the trial court's determination is sufficient to support the Injunction.

## II.  Tailoring of the Injunction under *Madsen*

It remains to be determined, however, whether the Injunction is content neutral and burdens no more of the Galapos' speech than necessary to serve a significant governmental interest.  *Madsen*, 512 U.S. at 765.  To answer that question, I look no further than the Superior Court's and Judge Stabile's well-reasoned analyses.  Indeed, I agree with the Superior Court that the Injunction is content neutral because the Injunction does not refer to the content or subject of the Galapos' signs and because the purpose of the Injunction, as stated by the trial court, is to protect the quiet enjoyment of the Oberholzers' home—*not* to censor the message on the Galapos' signs.  *Oberholzer*, 274 A.3d at 757.  Support for the Superior Court's reasoning in that regard can be found in *Madsen*, *Frisby*, *Klebanoff*, and *SmithKline Beecham Corp. v. Stop Huntingdon Animal*

*Cruelty USA*, 959 A.2d 352 (Pa. Super. 2008), all of which reached the same conclusion. *See SmithKline*, 959 A.2d at 358-59 (upholding facially content-neutral injunction banning "picketing, demonstrating, leafleting, protesting or congregating at the homes of the Individual Plaintiffs").

I further agree with Judge Stabile's concurring opinion that it is difficult to "fathom a more narrowly tailored remedy . . . than that ordered by the trial court." *Oberholzer*, 274 A.3d at 770 (Stabile, J., concurring). As Judge Stabile explained:

> The trial court took a very measured and narrow approach to fashioning its injunction to protect [the Oberholzers'] privacy interest in their home by ordering only that the signs be positioned so as not to face [the Oberholzers'] property. When this initial directive proved ineffective because the messages nonetheless could be read through the back of the signs, the [trial] court entered an amended injunction (now on appeal) ordering that the sign material be opaque so that the messages could not be seen even when the signs were turned away from [the Oberholzers'] home. The trial court did not ban or seek to modify any content of the offending signs. It did not limit the number of signs or the number of messages that could be posted. No restriction was placed on the time when the signs could be placed, the location of the signs upon [the Galapos'] property, or who may see the signs other than [the Oberholzers]. In sum, the only restraint the [trial] court imposed upon [the Galapos'] personal protest against [the Oberholzers] was to construct the signs of opaque material and to face the signs away from [the Oberholzers'] home. In my opinion, the trial court took the most conservative approach to enjoining [the Galapos'] conduct that burdened no more speech than necessary to serve a significant government interest to address the unwanted messaging targeted at [the Oberholzers] that could be seen from within the privacy of their home. . . . Under these circumstances, I would conclude that the trial court's improper reliance upon a time, place and manner standard to fashion its injunctive remedy was harmless error not warranting a remand.

*Id*. at 769-70 (Stabile, J., concurring). In fact, the trial court's Injunction left a multitude of channels for the Galapos to disseminate anti-hate and anti-racism messages, including, but not limited to, leaflets, phone banking, billboards, and picketing in public areas or throughout their residential neighborhood. The Injunction simply prevented the Galapos from directing their messages at the Oberholzers in a manner disrupting the quiet

enjoyment of their home. Finally, the relevant case law convincingly demonstrates that protecting the quiet enjoyment of the home is a significant governmental interest. *Carey*, 447 U.S. at 471 ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."). Accordingly, I see no error in the trial court's reasoning supporting the Injunction.

### III. Conclusion

I would conclude that the trial courts of this Commonwealth have the authority to enjoin residential speech protected by Article I, Section 7 of the Pennsylvania Constitution that rises to the level of a private nuisance and disrupts the quiet enjoyment of a neighbor's home. I would further find that the Injunction is content neutral, furthers the Commonwealth's significant interest in protecting the privacy and quiet enjoyment of the Oberholzers' home, and burdens no more of the Galapos' speech than necessary to protect the Oberholzers' right to residential privacy. *Madsen*, 512 U.S. at 765. Accordingly, I would reverse the Superior Court's judgment vacating the trial court's order and reinstate the Injunction.